**CONSTANTINE MARANTIDIS, CA Bar No. 173318**
cmarantidis@lewisroca.com
**G. WARREN BLEEKER, CA Bar No. 210834**
wbleeker@lewisroca.com
**KYLE W. KELLAR, CA Bar No. 294253**
kkellar@lewisroca.com
**LEWIS ROCA ROTHGERBER CHRISTIE LLP**
**655 N. Central Avenue, Suite 2300**
**Glendale, CA 91203-1445**
**Telephone: (626) 795-9900**
**Facsimile:  (626) 577-8800**

Attorneys for Defendant and Counterclaimant
DELTA SCIENTIFIC CORPORATION

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MERIDIAN RAPID DEFENSE GROUP LLC, a California limited liability company,<br><br>Plaintiff,<br><br>vs.<br><br>DELTA SCIENTIFIC CORPORATION, a California corporation,<br><br>Defendant. | Case No. 2:23-cv-07222-GW (PDx)<br><br>**DEFENDANT AND COUNTERCLAIMANT DELTA SCIENTIFIC CORP.'S FOURTH AMENDED ANSWER AND COUNTERCLAIMS TO MERIDIAN RAPID DEFENSE GROUP LLC'S COMPLAINT** |
| DELTA SCIENTIFIC CORPORATION, a California corporation,<br><br>Counterclaimant,<br><br>vs.<br><br>MERIDIAN RAPID DEFENSE GROUP LLC, a California limited liability company, and PETER D. WHITFORD, an individual,<br><br>Counterdefendants. | **DEMAND FOR JURY TRIAL**<br><br><br>**Hon. George H. Wu** |

655 North Central Avenue
Suite 2300
Glendale, CA 91203-1445

LEWIS ROCA

Defendant and Counterclaimant Delta Scientific Corporation ("Delta") files its Fourth Amended Answer to Plaintiff and Counterdefendant Meridian Rapid Defense Group LLC's ("Plaintiff" or "Meridian") Complaint in which Meridian asserts claims of infringement of United States Patent Nos. 7,918,622 ("the '622 patent") and 8,215,866 ("the '866 patent") (collectively, the "Asserted Patents"). Except as expressly admitted below, Delta denies all allegations and averments of the Complaint, and otherwise responds as follows:

## GENERAL DENIAL

Unless expressly admitted below, Delta denies each, and every allegation that Plaintiff has set forth in its Complaint.

## RESPONSE TO PLAINTIFF'S SPECIFIC ALLEGATIONS

Answering the specific allegations of Plaintiff's Complaint, Delta responds with the following paragraphs, which correspond sequentially to the paragraphs in Plaintiff's Complaint:

1.     Upon information and belief, Plaintiff Meridian Rapid Defense Group LLC is a Delaware limited liability company with its principal place of business at 177 E. Colorado Blvd., Suite 200, Pasadena, California 91105.

2.     Delta admits that it is a California Corporation with its headquarters at 40355 Delta Lane, Palmdale, California 93551.

3.     Delta does not challenge that this Court has subject matter jurisdiction under 38 U.S.C. § 1331 and 1338(a).

4.     Delta does not challenge that this Court has personal jurisdiction over Defendant. Delta denies the remaining allegations in Paragraph 4.

5.     Delta does not challenge that venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (c), and 1400(b). Delta denies the remaining allegations in Paragraph 5.

6.     Delta is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 6 and, therefore, denies the same.

655 North Central Avenue
Suite 2300
Glendale, CA 91203-1445

LEWIS ROCA

7.      Delta is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 7 and, therefore, denies the same.

8.      Delta is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 8 and, therefore, denies the same.

9.      Delta is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 9 and, therefore, denies the same.

10.     Delta is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 10 and, therefore, denies the same.

11.     Delta is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 11 and, therefore, denies the same.

12.     Delta is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 12 and, therefore, denies the same.

13.     Delta admits that it describes itself as the world's leading manufacturer of vehicle access control equipment.  Delta further admits it has manufactured and sold portable barriers, such as the MP5000, DSC1000, and DSC1100.

14.     Delta admits that its barriers are portable.  Delta is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 14 and, therefore, denies the same.

15.     Delta admits the allegations in Paragraph 15.

16.     Delta admits the allegations in Paragraph 16.

17.     Delta admits the allegations in Paragraph 17.

18.     Delta admits the allegations in Paragraph 18.

19.     Delta admits the allegations in Paragraph 19.

20.     Delta admits that it is making, using, selling, and offering for sale the TB100.  Delta further admits that it denies infringement, and it intends to continue to sell the TB100.  Delta denies that the TB100 or any of its products infringe Plaintiff's Asserted Patents.  Delta is without knowledge or information sufficient

655 North Central Avenue
Suite 2300
Glendale, CA 91203-1445

LEWIS ROCA

to form a belief as to the truth of the remaining allegations in Paragraph 20 and, therefore, denies the same.

## COUNT 1
### (Alleged Infringement of U.S. Patent No. 7,918,622)

21.    Delta incorporates by reference each of the preceding paragraphs as if fully set forth herein.

22.    Delta denies that United States Patent No. 7,918,622 ("the '622 patent") is titled "Portable Perimeter Defense Systems."  Upon information and belief, the '622 patent states on its face that it is entitled "Portable Perimeter Defense System."

23.    Delta is without knowledge or information sufficient to form a belief as to the truth of allegations in Paragraph 23 and, therefore, denies the same.

24.    Delta admits that the '622 patent generally relates to portable perimeter defense systems.  Delta denies that the claims of the '622 patent, including claim 21, recite novel and inventive systems and methods.

25.    Delta admits the allegations in Paragraph 25.

26.    Delta denies the allegations in Paragraph 26.

27.    Delta admits the allegations in Paragraph 27.

28.    Delta denies the allegations in Paragraph 28.

29.    Delta denies the allegations in Paragraph 29.

30.    Delta denies the allegations in Paragraph 30.

31.    Delta denies the allegations in Paragraph 31.

32.    Delta denies the allegations in Paragraph 32.

33.    Delta denies the allegations in Paragraph 33.

34.    Delta admits that Figure 11 depicts a test configuration, where a heavy truck is about to collide with the TB100. Delta further admits that Figure 12 depicts the heavy truck mid-collision. Delta denies the remaining allegations in Paragraph 34. In particular, Figure 12 shows that the TB100 is moved horizontally

655 North Central Avenue
Suite 2300
Glendale, CA 91203-1445

LEWIS ROCA

upon impact, contrary to the allegations in Paragraph 34 that any part of the TB100 is "to prevent horizontal movement of the barrier upon impact."

35. Delta denies the allegations in Paragraph 35.

36. Delta denies the allegations in Paragraph 36.

37. Delta denies the allegations in Paragraph 37.

38. Delta denies the allegations in Paragraph 38.

39. Delta denies the allegations in Paragraph 39.

40. Delta denies the allegations in Paragraph 40.

41. Delta denies the allegations in Paragraph 41.

42. Delta denies the allegations in Paragraph 42.

43. Delta denies the allegations in Paragraph 43.

44. Delta denies the allegations in Paragraph 44.

45. Delta admits that it has at least a significant role in placing the TB100 in the stream of commerce in the United States, including in this District. Delta further admits that it directs or controls the making, shipment, and sales of the TB100 into the United States, including use of established distribution channels around the United States, and through its own websites. Delta denies the remaining allegations in Paragraph 45.

46. Delta denies the allegations in Paragraph 46.

47. Delta denies the allegations in Paragraph 47.

48. Delta denies the allegations in Paragraph 48.

49. Delta denies the allegations in Paragraph 49.

**COUNT 2**
**(Alleged Infringement of U.S. Patent No. 8,215,866)**

50. Delta incorporates by reference each of the preceding paragraphs as if fully set forth herein.

51. Delta admits that United States Patent No. 8,215,866 ("the '866 patent") is titled "Portable Perimeter Defense Barrier and System."

52.     Delta is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 52 and, therefore, denies the same.

53.     Delta admits that the '866 patent generally relates to portable perimeter defense barriers and systems.  Delta denies that the claims of the '866 patent, including claim 49, recite novel and inventive systems and methods.

54.     Delta admits the allegations in Paragraph 54.

55.     Delta denies the allegations in Paragraph 55.

56.     Delta admits the allegations in Paragraph 56.

57.     Delta denies the allegations in Paragraph 57.

58.     Delta denies the allegations in Paragraph 58.

59.     Delta admits that Figure 17 depicts a wheel assembly of the TB100. Delta denies the remaining allegations in Paragraph 59.

60.     Delta admits that Figure 18 depicts a zoomed-in image of the TB100 wheel assembly.  Delta denies the remaining allegations in Paragraph 60.

61.     Delta denies the allegations in Paragraph 61.

62.     Delta denies the allegations in Paragraph 62.

63.     Delta denies the allegations in Paragraph 63.

64.     Delta denies the allegations in Paragraph 64.

65.     Delta denies the allegations in Paragraph 65.

66.     Delta denies the allegations in Paragraph 66.

67.     Delta denies the allegations in Paragraph 67.

68.     Delta denies the allegations in Paragraph 68.

69.     Delta denies the allegations in Paragraph 69.

70.     Delta denies the allegations in Paragraph 70.

71.     Delta denies the allegations in Paragraph 71.

72.     Delta denies the allegations in Paragraph 72.

73.     Delta denies the allegations in Paragraph 73.

74.     Delta denies the allegations in Paragraph 74.

655 North Central Avenue
Suite 2300
Glendale, CA 91203-1445

LEWIS ROCA

75. Delta denies the allegations in Paragraph 75.

76. Delta admits that it has at least a significant role in placing the TB100 in the stream of commerce in the United States, including in this District. Delta further admits that it directs or controls the making, shipment, and sales of the TB100 into the United States, including use of established distribution channels around the United States, and through its own websites. Delta denies the remaining allegations in Paragraph 76.

77. Delta denies the allegations in Paragraph 77.

78. Delta denies the allegations in Paragraph 78.

79. Delta denies the allegations in Paragraph 79.

80. Delta denies the allegations in Paragraph 80.

## PRAYER FOR RELIEF

Plaintiff's Prayer for Relief contains requests for relief to which no response is required. To the extent a response is required, Delta denies that Plaintiff is entitled to any relief from Delta in connection with the Complaint, including, without limitation, the relief specified in Plaintiff's Prayer for Relief.

## DELTA'S AFFIRMATIVE DEFENSES

Delta asserts the following affirmative defenses to Plaintiff's Complaint. Delta reserves the right to amend its Answer to plead additional defenses including, but not limited to, those defenses revealed during discovery. Delta does not assume the burden of proof where such burden is not legally upon it. Without admitting or acknowledging that Delta bears the burden of proof as to any of the following, based upon information and belief, Delta asserts the following affirmative defenses:

## FIRST AFFIRMATIVE DEFENSE

### (Non-Infringement)

1. Delta does not make, use, sell, offer for sale, or import into the United States, and has not made, used, sold, offered for sale or imported into the

655 North Central Avenue
Suite 2300
Glendale, CA 91203-1445

LEWIS ROCA

United States, any products or methods that infringe any valid claim of the Asserted Patents, either willfully, directly, indirectly, contributorily, through the doctrine of equivalents, or otherwise, and has not induced others to infringe any valid claim of the Asserted Patents.

## SECOND AFFIRMATIVE DEFENSE

### (Invalidity)

2.    Upon information and belief, and without prejudice to further amendment upon information found during discovery, each asserted claim of the '622 patent, and the '866 patent is invalid for failure to meet the conditions for patentability as set forth in Title 35 of the United States Code, including, but not limited to, 35 U.S.C. § 102, § 103, and/or § 112, which will be explained in more detail in Meridian's invalidity contentions.

3.    The inventorship of the Asserted Patents is false due to the non-joinder of Mr. Jeffrey Fromm, rendering both of the Asserted Patents invalid under 35 U.S.C. § 102(f).

### Jeffrey Fromm's Rapid Deployment Barrier (RDB) Invention

4.    On information and belief, Jeffrey Fromm conceived the rapid deployment barrier device described and claimed in Plaintiff's Asserted Patents. Plaintiff's founder and CEO, Peter D. Whitford, appears to have fraudulently named himself as the sole inventor on both of the Asserted Patents.

5.    On information and belief, Jeffrey Fromm had many years of experience in the security field.  He was a correctional officer, deputy sheriff, and a United States Marshal guard providing court security and transportation of federal prisoners. Mr. Fromm worked as a hostage negotiator and was certified in use of the AR 15, 12 gauge shotgun, and 9 millimeter pistol. Following the tragedy of September 11th, Mr. Fromm became very interested in anti-terrorist security.

6.    In or about 2005, Mr. Fromm formed his own company, Fromm Barriers, Inc. ("Fromm Barriers"), a Pennsylvania-based company that

designed and built tactical/anti-terrorism barrier systems. Fromm Barriers also provided training regarding field tactical deployment of their Rapid Deployment Barriers ("RDB") barriers. Mr. Fromm designed, developed, and received a patent for his inventions related to barrier devices capable of rapid deployment and assembly to form a barrier wall, U.S. Patent No. 7,494,112.

### Fromm Barriers Seeks Funding From Investor Peter Whitford And His Brand Development Company Whitmarks

7.      On information and belief, in 2005, Mr. Whitford's company, Whitmarks Corporation ("Whitmarks"), provided three services, brand development, brand communication, and brand licensing.

8.      On information and belief, Mr. Whitford's educational background is exclusively in marketing. Mr. Whitford has an undergraduate degree and graduate degree in marketing.

9.      On information and belief, in 2005 and until Mr. Whitford met with Mr. Fromm in 206, neither Mr. Whitford, an Australian citizen, nor his company Whitmarks, had any experience or background in security systems or the design or development of barrier devices. Mr. Whitford instead had experience overseeing specialty apparel companies, such as Country Road (apparel company), Structure (apparel company), Wet Seal, Inc., (a leading specialty teen retailer of fashionable and contemporary apparel and accessory items), and the Disney retail stores.

10.     As explained by Mr. Whitford in his declaration submitted in *Meridian Rapid Defense Group LLC v. Fromm Barriers, Inc.*, Case No. CV 07-3201-ODW(RCx) (C.D. Cal. Sept. 14, 2007)[1], in or around 2006, Mr. Whitford was approached by Joel Mayer on behalf of Fromm Barriers to provide financing to Fromm Barriers, Inc. to assist with marketing Fromm Barriers' RDB 54 barrier, which was invented by Jeffrey Fromm.

---

[1] A copy of this declaration and attachments is attached hereto as Exhibit K.

655 North Central Avenue
Suite 2300
Glendale, CA 91203-1445

LEWIS ROCA

11.     According to Mr. Whitford, prior to September 2006, he was informed as to the design and operating principles of Fromm Barriers' RDB 54 barrier by at least Howard Kaufman and Mr. Fromm.  Further, Mr. Whitford saw at least detailed photographs of the RDB 54 barrier, including those shown in Exhibit A to Mr. Whitford's declaration (hereinafter referred to as the "RDB 54 one-sheet").

12.     At a September 13, 2006, meeting between, *inter alia*, Mr. Fromm and Mr. Whitford, the RDB 54 barrier was discussed and the meeting minutes, attached to Exhibit B to Mr. Whitford's declaration, indicate that "Patents" were also discussed.  This is apparently a reference to Mr. Fromm's then-pending patent application that would eventually mature into U.S. Patent No. 7,494,112.  Indeed, the pre-grant publication of Fromm's '112 Patent did not publish until November 29, 2007, as US 2007/0272911 A1, over a year after Mr. Fromm apparently described his pending patent application to Mr. Whitford.

13.     Despite these negotiations and substantial disclosure of information from Mr. Fromm to Mr. Whitford, Fromm Barriers and Mr. Whitford never came to any agreement. Mr. Whitford stated in his declaration "[i]t became clear to me by December, 2006, that for various reasons, the parties would not be able to come to an agreement."

**Mr. Whitford Immediately Seeks Patent Protection For Mr. Fromm's**
**Rapid Deployment Barriers And Mr. Whitford Falsely Claims**
**To Be The Sole Inventor**

14.     On May 7, 2007, only a few months after determining he could not come to any agreement to invest in Mr. Fromm's company, and with no apparent independent prior experience involving security barriers (except what he had learned from meeting with Fromm), Mr. Whitford filed provisional patent application No. 60/928,332, which eventually led to the issuance of Plaintiff's Asserted Patents. Mr. Whitford fraudulently named himself as the sole inventor.

655 North Central Avenue
Suite 2300
Glendale, CA 91203-1445

15.    The similarities between the Asserted Patents and Mr. Fromm's RDB 54 barrier/Fromm's patent, both of which were described and disclosed to Mr. Whitford prior to their general public disclosure, show that Mr. Fromm conceived the patented invention and, at the very least, is a co-inventor of the claims of the Asserted Patents.  Based on Mr. Whitford's 2007 declaration and a visual comparison between Mr. Fromm's RDB 54 barrier and Mr. Whitford's patented barrier (below), the subject matter of the asserted patents, and of their claims, is substantially based on discoveries, advances, and innovations by Mr. Fromm in his RDB 54 barrier.  By misrepresenting himself as the sole inventor of the asserted patents, Mr. Whitford committed inequitable conduct in procuring both Asserted Patents, and the Asserted Patents are both invalid.



**Mr. Fromm's RDB 54 Barrier**      **Mr. Whitford's Patented Barrier**

16.    It appears that Mr. Fromm invented, at least, the general structure of what would later become the subject of Mr. Whitford's Asserted Patents, including at least:

- a mobile or portable barrier that provides protection against both vehicular incursions and active shooter situations;

- a modular barrier that can be connected to other barriers having the same or similar configuration to provide a customizable barrier solution;

- a base plate;

- • an upright plate extending perpendicular to the base plate;

- • the upright plate being designed and configured to protect against munitions;

- • a brace extending between a rear surface of the upright plate and the base plate;

- • anchors or other members protruding onto or into the ground from the base plate to improve resistance to horizontal movement; and

- • a wheel assembly that can be engaged to allow the barrier to be easily moved and disengaged to convert the barrier to an anti-vehicle barrier.

17.    It is unclear at this point what inventive contributions, if any at all, can be properly attributed to Mr. Whitford.  Mr. Whitford, therefore, certainly had no proper basis to represent to the USPTO that Whitford was the **sole** inventor for the Asserted Patents. For at least these reasons, the inventorship of the Asserted Patents is false due to the non-joinder of Mr. Jeffrey Fromm, rendering both of the Asserted Patents invalid under 35 U.S.C. § 102(f).

18.    Further, based on the failed business negotiations between Mr. Fromm and Mr. Whitford and disputes over funds to be repaid to Mr. Whitford, on information and belief, Mr. Whitford acted with deceptive intent in failing to name Mr. Fromm as a co-inventor to avoid Mr. Fromm from receiving any ownership interest in the Asserted Patents.

### THIRD AFFIRMATIVE DEFENSE

### (Prosecution History Estoppel)

19.    Upon information and belief, by reason of the proceedings before the United States Patent and Trademark Office ("USPTO") during the prosecution of the applications resulting in the issuance of the '622 patent and the '866 patent, namely, the admissions, representations and amendments made on behalf of the applicants for those patents, Plaintiff is estopped from extending the coverage of

655 North Central Avenue
Suite 2300
Glendale, CA 91203-1445

LEWIS ROCA

the asserted claims in the '622 patent and the '866 patent, including under the doctrine of equivalents, to cover the accused instrumentalities.

20.    For example, in the Office Action dated May 27, 2010, issued in the application that would mature into the '622 patent, the Examiner rejected claim 1 based on the brace of the claimed modular barrier of United States Patent No. 5,549,410.  In response to the Examiner's rejection, the applicant amended claim 1 to claim a brace that is fixedly secured, once the barrier is positioned, to the aft side of the upright plate of the barrier, for preventing aft tilting under a force generated by an object impacting the front plate.

21.    Upon information and belief, this amendment of claim 1 specifically narrowed its scope from encompassing all bracing systems and limited the interpretation of claim 1 to the brace that was previously described.

22.    As another example, in the May 27, 2010, Office Action in the '622 patent, the Examiner rejected claim 24 in view of, *inter alia*, United States Patent No. 5,549,410 to Beryozkin.   In response to this rejection, the applicant characterized as-filed claims 24-26, which issued as claims 21-23, as "include[ing] limitations directed to the aft edge of the barrier which is configured to provide an abutting surface which, it is believed, when combined with the barrier's weight, provides sufficient frictional forces to limit horizontal movement of the modular barrier upon impact."  The applicant went on to state that "The Examiner cites the Beryozkin patent as suggesting this feature" and thereafter distinguished Beryozkin on the ground that "the 'base plate' [of Beryozkin] is not substantially parallel to the ground surface as presently claimed" and "[t]he 'penetrates' 14' and 18' merely extend from a particular point along a curved barrier surface, distant from the ground surface and only cooperates with the ground when the barrier substantially pivots about its wheels."

23.    Despite these representations to the Examiner characterizing the claimed subject matter of asserted claim 21 of the' 622 Patent, in this lawsuit, the

alleged aft edge of the base plate of the accused bollard only cooperates with (or impacts) the ground when the accused bollard is pivoted *after* impact by a vehicle, substantially similar to the operation of the admittedly distinguishable barrier in Beryozkin.  Because the applicant differentiated Beryozkin from the claimed embodiment because "the 'penetrates' 14' and 18' … only cooperates with the ground when the barrier substantially pivots," the scope of the asserted claim has been narrowed to preclude an aft edge of a base plate that only cooperates with (or impacts) the ground when the barrier is pivoted, which precludes Plaintiff's infringement theory as to the accused bollard as it relies on the pivoting or tilting of the accused bollard for the alleged aft edge to cooperate with the ground surface.

24.    Further, after the accused bollard is impacted by a vehicle, only a small portion of the accused bollard's weight will react on the alleged aft edge such that the alleged aft edge of the accused bollard does not act to prevent horizontal movement "when combined with the barrier's weight," contrary to the applicant's characterization of claim 21 and further evidencing that Plaintiff's infringement theory runs afoul the applicant's own representations as to the scope of claim 21 of the '622 patent to the Examiner to overcome Beryozkin.

## **FOURTH AFFIRMATIVE DEFENSE**

### **(Patent Misuse)**

25.    Plaintiff's claims are barred as a result of its patent misuse.

26.    Upon information and belief, and as one example, Plaintiff improperly attempts to broaden the scope of asserted claim 21 of the '622 patent to cover noninfringing products, including Delta's TB100 bollard, by interpreting the "upright plate" as the *cylindrical* body of the TB100 bollard as shown in Figure 9 of Plaintiff's Complaint (reproduced below) and the "width of said base plate" as being the diagonal dimension of the apparently square baseplate of the TB100 bollard in Figure 13 of Plaintiff's Complaint (reproduced below).

655 North Central Avenue
Suite 2300
Glendale, CA 91203-1445

LEWIS ROCA



Figure 9[10]

Figure 13[15]

27.     First, Plaintiff's interpretation of "upright plate" as covering a cylindrical member is contrary to the plain and ordinary meaning of "plate" and unreasonable in light of the '622 patent. Indeed, a plate is commonly understood to be a thin, flat sheet-shaped element, which is consistent with the '622 patent's disclosure that the "[f]ront surface 15 [of the front plate 3] preferably offers ballistic protection" for people standing behind the barrier. The cylindrical member in Delta's TB100 bollard is neither plate-shaped nor configured to offer an individual standing behind the cylindrical upright ballistic protection. Indeed, the cylindrical member in Delta's TB100 bollard is a near opposite shape as the "upright plate" described and claimed in the '622 patent. The '622 patent also fails to re-define the term "plate" as covering non-plate shapes, such as a cylindrical shape. The only description of the "front plate" or "upright plate" shows a thin, flat shape and the

only dimensional example of the front plate provided in the '622 patent is that it is "approximately 3 feet tall and 2 feet wide," that is, rectangular.

28.     Further, Plaintiff's interpretation of "width of said base plate" is not only incorrect as being contrary to the plain and ordinary meaning of the term "width" but also because it would render claim 21 of the '622 patent invalid as anticipated by prior art known to Plaintiff as of the filing of its Complaint.  First, elementary math dictates that the width of a rectangle is the dimension along its shorter side, or in the case of a square, is the dimension along any side.  This is confirmed by the mathematically accepted formula to determine the area of a rectangle, which is length times width, or of a square, which is side length (width and length being identical) squared.  Thus, "width" is different from the diagonal dimensional (or diagonal length), which is the distance between opposite corners of the rectangle or square and which Plaintiff proposes equating with "width" as recited in the '622 patent.  If one applied Plaintiff's definition of "width" to the formula to determine the area of a rectangle, an incorrect value would result, confirming the unreasonableness of Plaintiff's proposed interpretation. For example, a square having 12" side length (i.e., a width and a length of 12") has a diagonal length of 16.97".  But the mathematically accepted area of said square is 144 in.$^2$ (i.e., 12$^2$), not 287.9809 in.$^2$ (i.e., 16.97$^2$).  Thus, Plaintiff's proposed interpretation of "width" is not only incorrect but is unreasonable as being contrary to accepted mathematical principles[2].

29.     Second, upon information and belief, as of the filing of its Complaint, Plaintiff knew that its interpretation of "width of said base plate" and "a non-planar aft edge," as applied to Delta's accused product, would render at least claim 21 of the '622 patent invalid in view of prior art known to Plaintiff as of the filing of the

---

[2] The '622 patent also does not attempt to re-define the definition of "width" nor does it clearly set forth a special definition of the term "width."

655 North Central Avenue
Suite 2300
Glendale, CA 91203-1445

LEWIS ROCA

Complaint.  In particular, in the Office action dated May 27, 2010, in the application that matured into the '622 patent, the Examiner cited Figure 7 of U.S. Patent No. 4,854,767 to Sasaki ("Sasaki") as disclosing "an upright plate (4)" and "[a] base plate (2) for positioning on the ground, such that the upright plate (4) extends perpendicularly to the base plate (2)."  Office action dated May 27, 2010, page 2.  In rejecting claim 24, which corresponds to issued claim 21, the Examiner asserted that "Sastaki [sic] discloses essentially all that is claimed, as put forth with respect to claim 1 above, but does not disclose providing friction elements to prevent horizontal movement of said barrier." *Id*., page 5.  The applicant responded to the May 27, 2010, Office action on October 26, 2010, stating that, with respect to pending claim 24, issued claim 21, "[a]greement was reached that claim language directed to the base plate being substantially parallel to the ground surface or that the arcuate aft edge extends along a length of the base plate edge overcomes the stated rejection."

30.    In spite of these representations to the U.S. Patent Office, Plaintiff now attempts renege on its agreement with the U.S. Patent Office by reading features out of claim 21 such that, under Plaintiff's own (flawed) interpretation, claim 21 would be invalid over Figure 7 of Sasaki under 35 U.S.C. § 102.



Figure 13[15]

**Plaintiff's Interpretation of Accused Product (Figure 13 of Complaint)**



**Figure 7 of Sasaki (annotations added to correspond to Plaintiff's Figure 13)**

31.    In other words, Plaintiff, by its Complaint, is attempting to improperly expand the scope of its patents beyond that which was granted by the USPTO, specifically to accuse Delta of infringement and to prevent Delta from making, using, selling, and offering for sale its competing TB100 product, rendering Delta unable to compete in the portable perimeter defense barrier market[3], and therefore, harming that market by preventing the rightful entry of a nascent competitor.

32.    As a second example, upon information and belief, as of the filing of its Complaint, Plaintiff knew that at least claim 49 of the '866 patent is invalid as

---

[3] Any reference herein to the "market for low-mass barricade solution[s]" is synonymous with the "portable perimeter defense barrier market," with the latter merely a more descriptive name of the same effective market covering the same products.  A complete definition of this term is provided at paragraph 143 of Delta's Fourth Amended Counterclaims, *infra*.

655 North Central Avenue
Suite 2300
Glendale, CA 91203-1445

LEWIS ROCA

being anticipated by or obvious in view of the pre-grant publication of its parent patent, that is, the '622 patent. In more detail, the application that would mature into the '866 patent was filed on July 21, 2010, as a continuation-in-part of the '622 patent. The application that would mature into the '622 patent first published as U.S. 2009/0067923 A1 on March 12, 2009. Thus, the pre-grant publication of the '622 patent, that is, U.S. 2009/0067923 A1, is prior art to the '866 patent under pre-AIA 35 U.S.C. § 102(b) because it was published on March 12, 2009, more than one year before the July 21, 2010 filing date of the '622 patent.

33.    By way of relevant background, asserted claim 21 of the '622 patent requires, in part, "said base plate of said modular barrier comprising a non-planar aft edge configured to frictionally engage the ground surface **to prevent horizontal movement of said modular barrier upon impact**." (emphasis added).

34.    The apparent new matter of the '866 patent recited in asserted claim 49 of the '866 patent, when compared to the '622 patent, is encompassed by the following limitation:

> said base plate having an aft and fore edge wherein said fore edge, facing the impact direction, comprises a vehicle engaging interface in the form of a nonlinear configuration extending along a portion of said base plate fore edge **wherein, under sufficient impact forces, said modular barrier pivots about said aft edge** and said fore edge engages an impacting vehicle.

(emphasis added).

35.    First, claim 21 of the '622 patent and claim 49 of the '866 patent describe and claim devices that operate to stop vehicle intrusion according to mutually exclusive principles. For example, claim 21 of the '622 patent recites a device that does not move horizontally upon impact to stop said vehicle while claim 49 of the '866 patent pivots such that the fore edge engages said vehicle to stop the vehicle. Such pivoting action (i.e., rotational movement) necessarily includes both horizonal and vertical components. Of particular interest, the portion of the

claimed barrier above the pivot point would move horizontally rearward while the portion of the claimed barrier below the pivot point would move horizontally forward. Yet, in spite of these mutually exclusive operating principles, Plaintiff accuses a single product, Delta's TB100 bollard, as infringing both claim 21 of the '622 patent and claim 49 of the '866 patent.

36.    Second, the '622 patent is entirely silent as to a barrier pivoting upon impact by a vehicle. Consistent with claim 21 of the '622 patent, the '622 patent only describes barriers that prevent horizontal movement upon vehicle impact to stop the vehicle. For this same reason, the '622 patent does not inherently disclose a barrier that pivots to stop an impacting vehicle because, as explained above, pivoting necessarily includes some horizontal movement, which the '622 patent expressly describes as being prevented.

37.    Nevertheless, by inconsistently accusing Delta's TB100 bollard as being both "to prevent horizontal movement ... upon impact" and being to "pivot about said aft edge and said fore edge engages an impacting vehicle," Plaintiff indicates, for the first time and many years after the filing of either of the patents-in-suit, that the same physical barrier can somehow both prevent horizontal movement and pivot upon impact of a vehicle, meaning that the prior disclosure of the embodiment shown in FIGS. 4A, 5, and 15 of U.S. 2009/0067923 A1 obviates at least claim 49 of the '866 patent. For at least these reasons, upon information and belief, Plaintiff knew that asserted claim 49 of the '866 patent is invalid as obvious in view of the pre-grant publication of its own parent patent, also owned by Plaintiff and asserted in its Complaint.



FIG. 4A



FIG. 15

38.    As a third example, Plaintiff brought suit, relying solely on the Asserted Patents, with knowledge that the inventorship of the Asserted Patents is

655 North Central Avenue
Suite 2300
Glendale, CA 91203-1445

LEWIS ROCA

false due to the non-joinder of Mr. Jeffrey Fromm, rendering both of the Asserted Patents invalid under 35 U.S.C. § 102(f), as explained more fully above.

39.    Upon information and belief, Plaintiff's knowingly overbroad interpretation of the '622 patent, rendering the only asserted claim thereof invalid over known prior art, its assertion of a known invalid claim of the '866 patent, and its assertion of knowingly invalid patents due to the non-joinder of Mr. Fromm, the details of which are provided above, has an anticompetitive effect because of the exclusionary effects inherent to the issuance of a patent, which Plaintiff hopes to exercise against Delta to prevent Delta's entry into and/or expansion in the market for portable perimeter defense barriers deployed in the United States. By preventing Delta from entering that market, Plaintiff's actions harm the market by significantly reducing lawful competition.

40.    Delta has been engineering and manufacturing vehicle access control equipment and selling its products worldwide since 1974. Delta is a well-known and well-established supplier of barrier systems with a long and successful track record of succeeding in barrier markets for more permanent barrier structures. Absent Meridian's unlawful acts, based on Delta's past track record and experience in supplying more permanent barrier structures to governmental and private entities for many decades, Delta would become a strong competitor to Meridian in the portable perimeter defense barrier market. By wrongfully asserting infringement in a manner that is well beyond the scope of its rights, and done in bad faith, Plaintiff impedes Delta's entry into the portable perimeter defense barrier market, which it was not in before the TB100 product.

41.    Further, on information and belief, Plaintiff commands a dominant share of the market for portable perimeter defense barriers such that it operates with substantial market power.  On information and belief, and based on publicly available information, Meridian's revenues for portable perimeter defense barriers deployed in the United States, from 2017 to date, exceeds $51 million.

655 North Central Avenue
Suite 2300
Glendale, CA 91203-1445

LEWIS ROCA

On information and belief, the other suppliers for such products, which includes both U.S.-based and foreign-owned suppliers that supply the relevant products into the U.S. market via U.S. distributors, total less than $5 million in total for revenues combined for portable perimeter defense barriers deployed in the United States, during that same timeframe.

42.    On information and belief, the two known foreign-owned suppliers, Mifram and Pitagone, each distribute their products in the United States via one or more U.S.-based distributors. On information and belief, Mifram barriers are offered for sale in the United States by a U.S.-based company, Security 20/20, Inc. On information and belief, Pitagone barriers are offered for sale in the U.S. via two distributors both located within the United States.  On information and belief, Meridian, therefore holds a substantial and significant share of the portable perimeter defense barrier market, between 80-90% or more.

43.    Further, to the extent Plaintiff has any meaningful competition in the market for portable perimeter defense barriers, any such competitor cannot increase capacity in the short run, and significant barriers to entry prevent new competitors from entering this market.  As explained below in Delta's Counterclaims, significant barriers to entry exist for all types of vehicle barriers, including the portable perimeter defense barriers at issue here.  Primarily, substantial design, development, testing, and certification requirements exist before a portable perimeter defense barrier system can be marketed and sold.  And, in connection with governmental sales, which constitute a substantial aspect of the vehicle barrier market, a supplier must not only offer a certified product but generally needs to show a satisfactory time-in-business, such as five years, before being approved by the GSA for sales to governmental entities.  These factors, alone or in combination, create substantial barriers to entry into the market for portable perimeter defense barriers, effectively restricting competition to only a handful of companies.

44.    Therefore, because Plaintiff is attempting to improperly broaden the scope of the '622 patent beyond the scope as granted by U.S. Patent Office and to assert a known invalid claim of the '866 patent in a manner that has anticompetitive effects, it has committed patent misuse.

### FIFTH AFFIRMATIVE DEFENSE

### (Failure to State a Claim)

45.    Upon information and belief, Plaintiff's patent infringement claims do not meet the heightened pleading standards required under *Twombly* and *Iqbal* because Plaintiff fails to allege facts as to how any of Delta's products, including the TB100, either directly or indirectly, literally or under the doctrine of equivalents, willfully or otherwise, infringe upon any claims of the '622 patent, or the '866 patent.

### SIXTH AFFIRMATIVE DEFENSE

### (Inequitable Conduct – Failure to Disclose Material Prior Art)

46.    Plaintiff's founder and CEO, Peter D. Whitford, is the sole listed inventor on both of the Asserted Patents.  *See* Exhibit A (Declaration of Peter D. Whitford, dated April 29, 2022), ¶6 ("I am the founder and have been the principal and majority owner of Meridian Rapid Defense Group LLC [] since it was formed ... on October 17, 2006.").

47.    According to Plaintiff's webpage at www.betterbarriers.com, as it was captured by the Internet Archive's Wayback Machine on August 3, 2009, a true and correct copy of which is attached hereto as Exhibit B, Plaintiff had publicly disclosed and was offering for sale and/or selling in the United States a product it called "Archer 500" as of December 22, 2008.  A true and correct copy of a PDF printout describing Plaintiff's Archer 500 barrier, as archived by the Internet Archive's Wayback Machine, is attached hereto as Exhibit C.  A true and correct copy of a schematic drawing of Plaintiff's Archer 500 barrier is attached hereto as Exhibit D.

48.     Peter Whitford, as the founder and CEO of Plaintiff, would have been aware of and deeply involved with the design, testing, launch, public disclosures, offers for sale, and any sales of the Archer 500 barrier.  Indeed, the Archer 500 was one of Plaintiff's first commercially available barriers, making it particularly notable for Peter Whitford.  Further, Plaintiff offers very few products for sale, making any publicly disclosed product notable.

49.     Plaintiff's Archer 500 barrier differs from the barrier disclosed in the '622 patent.  Notably, in the barrier disclosed in the '622 patent, distal ends of the side plates (28) are positioned distant from, or are spaced from, the fore edge of the base plate (2).  On the other hand, the Archer 500 barrier is truncated compared to the barrier disclosed in the '622 patent such that the side plates and the base plate present a continuous or coextensive fore edge.  *See also* Exhibit C ("Compared to the Archer 750, the Archer 500 is lighter and shorting in length....").  In other words, the distal ends of the side plates are co-planar or coextensive with the base plate fore edge.  A comparison between Figure 15 of the '622 patent and the Archer 500 barrier is provided below with the relevant portions of each picture highlighted by a red box.

655 North Central Avenue
Suite 2300
Glendale, CA 91203-1445

LEWIS ROCA

655 North Central Avenue
Suite 2300
Glendale, CA 91203-1445

LEWIS ROCA



*FIG.* 15



Exhibit C (annotated)



Exhibit D (annotated)

50.    The '622 patent also fails to disclose, in the specification (i.e., in the textual description), the continuous or coextensive side plate / base plate fore edge arrangement present in the Archer 500 barrier.  Thus, at least the fore edge configuration of Archer 500 barrier was not disclosed in the '622 patent.

51.    According to Plaintiff's own website, the Archer 500 barrier was publicly disclosed and offered for sale in the United States at least as early as December 22, 2008, more than one year before the July 21, 2010, filing date of the '866 patent[4]; thus, Plaintiff's Archer 500 barrier is prior art to at least claim 49 of the '866 patent under pre-AIA 35 U.S.C. § 102(b), which states, in relevant part, "the invention was ... described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of application for patent in the United States".  Peter Whitford, as the sole inventor of

---

[4] As explained above and reasserted here, at least asserted claim 49 of the '866 Patent is not entitled to the benefit of filing date of the '622 Patent.

125542953.3

both Asserted Patents, would have known that the new subject matter recited in claim 49 of the '866 patent, that is, the subject matter not disclosed in the '622 patent, is "wherein said fore edge, facing the impact direction, comprises a vehicle engaging interface in the form of a nonlinear configuration extending along a portion of said base plate fore edge wherein, under sufficient impact forces, said modular barrier pivots about said aft edge and said fore edge engages an impacting vehicle." Despite this knowledge, Peter Whitford failed to disclose the prior public disclosure and offer for sale and/or sale in the United States of Plaintiff's Archer 500 barrier, which includes the vehicle engaging interface as recited in claim 49 of the '866 patent, to the U.S. Patent Office during prosecution of the '866 patent.

52.    On July 21, 2010, and in connection with the filing of the continuation-in-part application that would mature into the '866 patent, Peter Whitford executed a declaration in which he expressly acknowledged, under penalty of perjury, "I/we acknowledge the duty to disclose to the United States Patent and Trademark Office all information known to me/us to be material to patentability as defined in 37 CFR 1.56, **including for continuation-in-part applications, material information which became available between the filing date of the prior application and the national or PCT International filing date of the continuation-in-part application**." (emphasis added).  A true and correct copy of Peter Whitford's July 21, 2010, declaration, as downloaded from the file wrapper of the '866 patent available at the U.S. Patent Office's website, is attached hereto as Exhibit E.

53.    Despite Peter Whitford's express acknowledgement of his duty to disclose material information that become available between the filing date of the '622 patent and the filing date of the '866 patent, which includes the prior public disclosure and offer for sale and/or sale in the United States of the Archer 500 barrier, Peter Whitford failed to disclose the existence of the Archer 500 barrier to the U.S. Patent office.  Indeed, Peter Whitford did not file a single information

655 North Central Avenue
Suite 2300
Glendale, CA 91203-1445

LEWIS ROCA

disclosure statement during the prosecution of the '866 patent despite the Archer 500 barrier being actually reduced to practice and offered for sale and/or sold prior to the filing date of the '866 patent.

54.     The Archer 500 barrier is but-for material to the '866 patent because it anticipates at least asserted claim 49 of the '866 patent, which recites:

49.     A portable perimeter defense system for stopping movement of a vehicle in an impact direction, the defense system comprising:
          a first modular barrier;
          said modular barrier comprising an upright plate and a base plate for positioning on a ground surface wherein said upright plate extends generally perpendicular to said base plate and a wheel assembly pivotally attached to said base plate such that said wheel assembly pivots between engaged and disengaged positions;
          said base plate having an aft and fore edge wherein said fore edge, facing the impact direction, comprises a vehicle engaging interface in the form of a nonlinear configuration extending along a portion of said base plate fore edge wherein, under sufficient impact forces, said modular barrier pivots about said aft edge and said fore edge engages an impacting vehicle.

55.     In particular, to the extent the preamble of claim 49 is limiting, the Archer 500 barrier is a portable perimeter defense system for stopping movement of a vehicle in an impact direction.  *See* Exhibit C ("[t]he Archer 500 ... offers exceptional vehicle stopping capabilities" and is "Rapidly deployable" and "Two person portable").

56.     The Archer 500, as shown and described in Exhibits C and D (annotated figures of which are provided below), includes a first modular barrier comprising an upright plate and a base plate for positioning on a ground surface. Further, the upright plate is shown as extending perpendicular to the base plate, which would include "generally perpendicular" as recited.  Exhibit C describes the Archer 500 barrier having a "[m]odular design" because it can be connected to other Archer 500 barriers.  *See id*. ("Deployment formations for the Archer 500 barrier include: ... Interconnected sets of 2 – 4 units").  In the below picture from

655 North Central Avenue
Suite 2300
Glendale, CA 91203-1445

LEWIS ROCA

655 North Central Avenue
Suite 2300
Glendale, CA 91203-1445

LEWIS ☐ ROCA

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Exhibit C, the base plate is shown as being positioned on the ground surface, and the upright plate extends perpendicular, to the base plate.



Exhibit C (annotated)



Exhibit D (annotated)

57.     The Archer 500 barrier also includes a wheel assembly pivotally attached to the base plate such that the wheel assembly pivots between engaged and disengaged positions.  In the below annotated picture from Exhibit C, the wheel assembly is in the engaged position, that is, the wheel assembly is pinned in the lower of the two pinholes.  As can be seen, the wheel assembly can also be pivoted about its axis pin to the disengaged position, that is, when the wheel assembly is pinned in the upper of the two pinholes.



58.     The same wheel assembly configuration present on the Archer 500 barrier was disclosed in the '622 patent.  Figure 11 of the '866 patent is reproduced below along with an excerpt from Exhibit D showing overlapping features in the wheel assembly.

655 North Central Avenue
Suite 2300
Glendale, CA 91203-1445

LEWIS ROCA

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

655 North Central Avenue
Suite 2300
Glendale, CA 91203-1445

LEWIS ROCA

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



FIG. 11



59.    The base plate of the Archer 500 barrier has an aft and fore edge as shown in the below annotated figures of the Archer 500 barrier.  The fore edge,

which faces the impact direction, includes a vehicle engaging interface in the form of a nonlinear configuration extending along a portion of the base plate fore edge. Additionally, under sufficient impact forces, the Archer 500 barrier would pivot about the aft edge and the fore edge would engage the impacting vehicle.



Exhibit C (annotated)



Exhibit D (annotated)

60.    In particular, the base plate fore edge has a shallow "U" shape configuration because the side plates and the base plate are welded together to

present a single, continuous fore edge.  The fore edge of the base plate of the Archer 500 barrier is nonlinear along a portion thereof either: (1) where the fore edge transitions from horizonal to vertical; and/or (2) at its vertically extending portion, which is nonlinear when compared to the horizontal portion of the fore edge.



Exhibit C (annotated)



Exhibit D (annotated)

61.    When a vehicle impacts the upright plate, the Archer 500 would pivot about the aft edge, causing the fore edge of the base plate as highlighted in the

655 North Central Avenue
Suite 2300
Glendale, CA 91203-1445

LEWIS ROCA

1    above figures to impact the underside of the impacting vehicle.  In more detail, the

2    vertical portion of the base plate fore edge would contact the impacting vehicle

3    before the horizontal portion of the base plate fore edge.

4        62.    Accordingly, the Archer 500 brochure and/or the public disclosure and

5    offer for sale and/or sale(s) in the United States of the Archer 500 barrier are but-for

6    material to the '866 patent because, had the Archer 500 barrier been disclosed to

7    the U.S. Patent Office, the U.S. Patent Office would not have allowed at least claim

8    49 of the '866 patent because it is anticipated by the Archer 500 barrier.

9        63.    Peter Whitford was aware of the disclosures of the '622 patent and the

10   '866 patent, including the new subject matter added to the '866 patent, by virtue of

11   him being the party that prepared and filed, and allegedly as the sole inventor of,

12   both patents, was knowledgeable of the Archer 500 barrier by virtue of his position

13   as Plaintiff's founder and CEO, and acknowledged, under penalty of perjury, his

14   duty to disclose "material information which became available between the filing

15   date of the prior application and the national or PCT International filing date of the

16   continuation-in-part application."  Despite his knowledge of the Archer 500 barrier,

17   its materiality to the '866 patent, and his acknowledged duty to disclose the same,

18   upon information and belief, Peter Whitford withheld the existence and public

19   disclosure of the Archer 500 barrier from the U.S. Patent Office with an intent to

20   defraud the U.S. Patent Office.  Indeed, the single most reasonable inference to be

21   gleaned from Peter Whitford's knowledge of the '866 patent and the characteristics

22   and configuration of the Archer 500 barrier, and his subsequent failure to disclose

23   this material information to the U.S. Patent Office during prosecution of the

24   '866 patent, is that he intended to deceive the U.S. Patent Office into granting the

25   '866 patent.

26       64.    In sum, during prosecution of the '866 patent (the "when"),

27   Peter Whitford (the "who") withheld the prior public disclosure and offer for sale

28   and/or sale(s) in the United States of his Archer 500 barrier, which anticipates at

655 North Central Avenue
Suite 2300
Glendale, CA 91203-1445

LEWIS ROCA

least asserted claim 49 of the '866 patent (the "what" and "where"). Had Peter Whitford disclosed the prior public disclosure and offer for sale and/or sale(s) in the United States of the Archer 500 barrier to the U.S. Patent Office, the Examiner would have rejected and not allowed at least claim 49 of the '866 patent (the "how" and "why"). Peter Whitford, as the sole inventor of the '866 patent and the prior '622 patent, knew the differences in disclosures between these patents and, as Plaintiff's founder and CEO, knew of its Archer 500 barrier and the public disclosure and offer for sale and/or sale(s) of the same. Peter Whitford also acknowledged, under penalty of perjury, his duty to disclose material information accruing between the filing of the '622 patent and the filing of the '866 patent yet failed to disclose to the U.S. Patent Office the existence of his Archer 500 barrier.

65. In addition, as explained above, during the 2005 and 2006 timeframe, Mr. Whitford learned and was informed as to the design and operating principles of Fromm Barriers' RDB 54 barrier and saw at least detailed photographs of the RDB 54 barrier, including the RDB 54 barrier one-sheet.

66. Mr. Whitford has declared under penalty of perjury that the RDB 54 one-sheet was publicly disclosed "on the Fromm Barriers' website" and was publicly circulated "at the Burbank trade show" for the National Tactical Officers Association in September 2006. On information and belief, the RDB 54 barrier itself was also publicly disclosed at the Burbank Trade Show in September 2006.

67. Further, during a September 13, 2006, meeting between, *inter alia*, Mr. Fromm and Mr. Whitford, the RDB 54 barrier was discussed and the meeting minutes, attached to Exhibit B to Mr. Whitford's declaration, indicate that "Patents" were also discussed. This is apparently a reference to Mr. Fromm's then-pending patent application that would eventually mature into U.S. Patent No. 7,494,112.

68. Delta asserts that Fromm Barrier, Inc.'s RDB 54 barrier is prior art to the Asserted Patents under pre-AIA 35 U.S.C. §§ 102(a) and/or 102(b).

655 North Central Avenue
Suite 2300
Glendale, CA 91203-1445

LEWIS ROCA

Upon information and belief, Fromm Barrier's RDB 54 barrier was publicly disclosed at least as early as September 10, 2006, at the National Tactical Officers Association Conference and Vender Show in Burbank, California, that is, before the earliest possible effective filing date of any claim of the '622 Patent of May 8, 2007.

69.    Delta further asserts that Fromm Barrier, Inc.'s RDB 54 barrier is prior art to the the '866 Patent under pre-AIA 35 U.S.C. § 102(b).

70.    As explained below, the RDB 54 barrier and the RDB 54 barrier one-sheet is but-for material to the Asserted Patents.  Had the RDB 54 barrier one-sheet been disclosed to the U.S. Patent Office, the U.S. Patent Office would not have allowed one or more claims of the Asserted Patents.  Further, the RDB 54 barrier and the RDB 54 barrier is non-cumulative of the Fromm patent, U.S. 7,494,112, considered by the Examiner during prosecution of the Asserted Patents.

71.    First, in the Background of the Invention section of the '622 Patent, Mr. Whitford described Fromm's patent as follows:

For example, U.S. Patent Application Publication No. US 2007/0272911 A1 (hereinafter the '911 application) discloses a markedly different barrier system. For example, the barrier system disclosed in the '911 application requires at least four people to install each barrier. Four people are required because the heavy, individual barriers according to the '911 application must be manually lifted to be positioned. The '911 application discloses interlocked adjacent barriers forming single rows of a desired length which may then be arranged in a "split V" configuration. The amount of physical exertion required to install the barrier system according to the '911 application is excessive and time consuming, which is disadvantageous in volatile environments wherein circumstances necessitate expedited installation of a defense system or wherein changing conditions warrant movement or other reconfiguration of a defense system. The '911 application does not provide a defense system with cooperating rows of barriers for increased strength and, due to its configuration, it is not modular and not capable of numerous configurations for changing threatening conditions and/or for alterations as part of a strategic deterrent system. Moreover, the barriers according to the '911 application do not provide the level of protection from munitions afforded by the portable perimeter defense system

655 North Central Avenue
Suite 2300
Glendale, CA 91203-1445

LEWIS ROCA

according to the present invention.

72.     The RDB 54 barrier, as disclosed at the Burbank Trade Show and as described in the one-sheet, includes a wheel assembly that allows the barrier to be "deployed by one person."  The RDB 54 barrier one sheet, which Mr. Whitford was in possession of but withheld from the examiner, states that the RDB 54 barrier has "360° traversing wheels mounted on the base plate of each barrier, the wheels allow the barrier to be maneuvered easily by one person from location to location."

73.     Fromm's patent that was considered by the examiner did not disclose wheels.  On information and belief, Mr. Whitford exploited this lack of disclosure in Fromm's patent to advance his own patent application despite his personal knowledge that the commercial embodiment of Fromm's patent, the RDB 54 barrier, included wheels that made it movable by a single person.  Thus, these withheld references are non-cumulative of the Fromm patents disclosed to and considered by the examiner in prosecuting the '622 patent.

74.     Further, during prosecution of the '622 patent, according to Mr. Whitford's attorney, the examiner allowed at least as-filed claim 36 because it recited a "wheel attachment which pivotably secures the wheel to the base plate such that the wheel may be moved from an engaged to a disengaged position."  Had the examiner been made aware of Fromm's RDB 54 barrier and the RDB 54 barrier one-sheet, which discloses this very wheel attachment concept, these claims would not have been allowed.  Thus, these withheld references are but-for material to at least one claim of the '622 patent.

75.     Peter Whitford was aware of the disclosures of the '622 patent and the '866 patent, by virtue of him being the purported sole named inventor of both patents, was knowledgeable of the RDB 54 barrier and the RDB 54 barrier one-sheet as explained above, and Mr. Whitford acknowledged, under penalty of perjury, his duty to disclose material information.  Despite his knowledge of the RDB 54 barrier and the RDB 54 barrier one-sheet, its materiality to the Asserted

Patents, and his acknowledged duty to disclose the same, upon information and belief, Peter Whitford withheld the existence and public disclosure of the RDB 54 barrier and the RDB 54 barrier one-sheet from the U.S. Patent Office with an intent to defraud the U.S. Patent Office. Indeed, the single most reasonable inference to be gleaned from Peter Whitford's knowledge of the Asserted Patents and the characteristics and configuration of the RDB 54 barrier and the RDB 54 barrier one-sheet , and his subsequent failure to disclose this material information to the U.S. Patent Office during prosecution of the Asserted Patents, is that he intended to deceive the U.S. Patent Office into granting the Asserted Patents.

76. In sum, during prosecution of the Asserted Patents (the "when"), Peter Whitford (the "who") withheld the prior public disclosure and/or offer for sale and/or sale(s) in the RDB 54 barrier, which anticipates one or more claims of the Asserted Patents (the "what" and "where"). Had Peter Whitford disclosed the prior public disclosure and/or offer for sale and/or sale(s) in the United States of the RDB 54 barrier to the U.S. Patent Office, the Examiner would have rejected and not allowed at least one claim of the Asserted Patents (the "how" and "why").

77. Accordingly, Plaintiff should be barred from enforcing any claim of the Asserted Patents.

**SEVENTH AFFIRMATIVE DEFENSE**
**(Inequitable Conduct – Material Misrepresentation**
**In Inventorship Declarations)**

78. Delta incorporates its Second Affirmative Defense and allegations herein.

79. On May 6, 2008, Mr. Whitford submitted a "Declaration [] For Utility Or Design Application Using Application Data Sheet" in connection with the filing of U.S. Patent Application No. 12/115,733 (the "'622 Inventorship Declaration"), which would eventually mature into the '622 Patent. In this Declaration,

Mr. Whitford attested "I believe that I am the original and first inventor of the subject matter which is claimed and for which a patent is sought."

80.    Mr. Whitford executed and filed the '622 Inventorship Declaration with the U.S. Patent Office despite his knowledge that he was not the original, first, or sole inventor of the subject matter claimed in the '622 Patent at least because he obtained not only the overall concept for a combination vehicular/personal barrier from Mr. Fromm but also many of the individual limitations claimed in the '622 Patent as explained above in connection with Delta's Second Affirmative Defense.

81.    The U.S. Patent Office would not have issued the '622 Patent had it known that Mr. Whitford's '622 Patent Inventorship Declaration was false. Further, Mr. Whitford intentionally omitted Mr. Fromm from the '622 Inventorship Declaration with deceptive intent to prevent Mr. Fromm from having any rights in the '622 Patent after their failed joint business venture.

82.    On July 21, 2010, Mr. Whitford submitted a "Declaration [] For Utility Or Design Application Using Application Data Sheet" in connection with the filing of U.S. Patent Application No. 12/841,137 (the "'866 Inventorship Declaration"), which would eventually mature into the '866 Patent.   In this Declaration, Mr. Whitford attested "I believe that I am the original and first inventor of the subject matter which is claimed and for which a patent is sought."

83.    When he executed and filed the '866 Inventorship Declaration with the U.S. Patent Office, Mr. Whitford knew that he was not the original, first, or sole inventor of the subject matter claimed in the '866 Patent at least because he obtained not only the overall concept for a barrier formed of two perpendicular plates from Mr. Fromm but also many of the individual limitations claimed in the '866 Patent as explained above in connection with Delta's Second Affirmative Defense.

84.    The U.S. Patent Office would not have issued the '866 Patent had it known that Mr. Whitford's '866 Patent Inventorship Declaration was false.

Further, Mr. Whitford intentionally omitted Mr. Fromm from the '866 Inventorship Declaration with deceptive intent to prevent Mr. Fromm from having any rights in the '866 Patent.

85.    In sum, during prosecution of each of the Asserted Patents (the "when"), Peter Whitford (the "who") falsely declared himself the "original, sole, and first inventor" of the subject matter claimed in the respective Asserted Patents with knowledge that he was *not* the original, sole, and/or first inventor with deceptive intent to prevent Mr. Fromm from having any rights in and to the Asserted Patents after their failed business negotiations (the "what" and "where"). Had Mr. Whitford disclosed that Mr. Fromm was a co-inventor of the claimed subject matter of the Asserted Patents to the U.S. Patent Office, the Examiner would have rejected and not allowed any claims of the Asserted Patents (the "how" and "why").

## **EIGHTH AFFIRMATIVE DEFENSE**
### **(Doctrine of Infectious Unenforceability)**

86.    Because of the immediate and necessary relation between Peter Whitford's inequitable conduct in the prosecution of the '622 patent, including the filing of a false inventorship declaration and the withholding of material prior art in the form of Mr. Fromm's RDB 54 barrier and the RDB 54 one-sheet, and the enforcement of this family of patents against the same product—Delta's TB100 bollard—the doctrine of infectious unenforceability applies to further bar Plaintiff from enforcing any claim of the later '866 patent.

87.    Accordingly, Plaintiff should also be barred from enforcing any claim of the '622 patent and of the '866 patent.

## **NINTH AFFIRMATIVE DEFENSE**
### **(Inequitable Conduct – Material Misrepresentation To Revive The Asserted Patents)**

88.    A Notice of Allowance was mailed by the U.S. Patent Office in the

655 North Central Avenue
Suite 2300
Glendale, CA 91203-1445

LEWIS ROCA

'622 patent on November 19, 2010.  That Notice states, in bold letters, "IMPORTANT REMINDER: Utility patents issuing on applications filed on or after Dec. 12, 1980 may require payment of maintenance fees.  It is patentee's responsibility to ensure timely payment of maintenance fees when due."

89.    After payment of the issue fee, the '622 patent issued on April 5, 2011.  Thus, the patent owner—Peter Whitford at all relevant times—had an obligation to pay maintenance fees to the U.S. Patent Office on the 3.5 year, 7.5 year, and 11.5 year anniversary of this issue date to keep the '622 patent in force, that is, to prevent the '622 patent from expiring.

90.    It is standard practice among patent practitioners to inform and explain to inventors and patentees their duty to pay maintenance fees.  To assist with this duty and obligation, the U.S. Patent Office will mail a Maintenance Fee Reminder to the address of record once a maintenance fee payment due date is missed and, if necessary, mails a Notice of Patent Expiration to the address of record after a patent expires for failure to pay a maintenance fee.  *See* MPEP § 2575.

91.    The 3.5 year maintenance fee for the '622 patent was due on October 6, 2014, but was paid early, on September 3, 2014.

92.    The 7.5 year maintenance fee for the '622 patent was due on October 5, 2018, but was not paid prior to the due date.  Accordingly, as is its standard practice, the U.S. Patent Office mailed a Maintenance Fee Reminder to the attorney of record, FisherBroyles, LLP ("FisherBroyles") on November 26, 2018.  *See* Exhibit F (Documents & transaction history of the '622 patent as downloaded from the U.S. Patent Office's Patent Center online system).  It is not only standard practice but can be negligent for a patent practitioner to fail to forward or at least inform its clients of such notices and allow patents to expire without receiving authorization from a client.  *See* Final Order, U.S. Patent Office Disciplinary Proceeding No. D2012-30, dated April 12, 2013 (finding violations of 37 C.F.R. § 10.77(c) "by allowing patents to expire for not timely paying

maintenance fees" and 37 C.F.R. § 10.23(a), (b), and (c)(8) "by not informing clients of important Office correspondence").

93.    Despite this Notice, Peter Whitford did not pay (or have paid) the 7.5 year maintenance fee within the six-month grace period after the due date, which ended on April 5, 2019.  Thus, the '622 patent expired on April 6, 2019, and as is its standard practice, the U.S. Patent Office mailed a Notice of Patent Expiration on May 13, 2019.  *See* Exhibit F.  On information and belief, Peter Whitford's patent counsel, FisherBroyles, would have forwarded or at least informed him of this Notice of Patent Expiration.

94.    During the three-year time period that the '622 patent was expired and the two-year time period that the '866 patent was expired, Delta's accused TB100 bollard gained popularity and market share.

95.    Over three years after the '622 patent expired, on April 29, 2022, Peter Whitford filed a Petition to Accept Unintentionally Delayed Payment of Maintenance Fee In An Expired Patent (the "'622 patent Petition to Revive").  A true and correct copy of the '622 patent Petition to Revive is attached hereto as Exhibit G, and a true and correct copy of Peter Whitford's declaration submitted in support of the '622 patent Petition to Revive is attached as Exhibit A (the "'622 patent Revival Declaration").  Because the '622 patent Petition to Revive was filed more than two years after the expiration of the '622 patent—indeed, it was filed more than *three* years after expiration—Peter Whitford was required to submit a declaration providing "additional explanation of the circumstances surrounding the delay that establishes the entire delay was unintentional."  *See* Exhibit G, page 3.  The U.S. Patent Office requires such a declaration because, according to the U.S. Patent Office, "[a]n extended period of delay (*i.e.,* more than two years from the date the application became abandoned, the patent expired, or a priority or benefit claim was due) in filing a petition to revive an application, accept a delayed maintenance fee payment, ... raises a question as to whether the entire delay was

125542953.3

655 North Central Avenue
Suite 2300
Glendale, CA 91203-1445

LEWIS ROCA

unintentional.  This may create uncertainty and unpredictability relating to patent rights in that **there is a greater likelihood that the entire delay may not be 'unintentional' ... as compared to a petition that was filed within a shorter time period** after the abandonment of the application, expiration of the patent...." 85 Fed. Reg. 41 at 12223 (published March 2, 2020) (emphasis added).

96.    In the '622 patent Revival Declaration, Peter Whitford asserted, under penalty of perjury, that, between 2006 and February 1, 2019, all mail for Plaintiff was received at his personal residence and, after that, was properly forwarded by the U.S. Postal Service to his new address.  Exhibit A, ¶7.  Peter Whitford further asserted that, after issuance of the '622 patent, "neither I nor Meridian received any communications related to, nor was I or Median aware of, the obligation to pay multiple maintenance fees."  *Id.*, ¶8.  In spite of purportedly not receiving any communication regarding his obligation to pay maintenance fees or the payment of the same, Peter Whitford's then-engaged law firm, FisherBroyles, LLP, apparently paid the 3.5 year maintenance fee for the '622 patent, which totaled $800, on Peter Whitford's behalf.  If Peter Whitford's declaration is to be believed, FisherBroyles, LLP paid this $800 maintenance fee without any communication to Peter Whitford and without seeking renumeration for the same, which is highly unlikely and simply not credible or plausible.  Also, if Peter Whitford is to be believed, FisherBroyles never sent, or he never received, the U.S. Patent Office's Maintenance Fee Reminder dated November 26, 2018, and the Notice of Patent Expiration dated May 13, 2019, which is highly unlikely and simply not credible or plausible.

97.    In his declaration, Peter Whitford vaguely states that "I understand now that a first maintenance fee (the 3.5 year fee) was paid by the law firm that assisted me in obtaining the '622 patent," but this means that Peter Whitford asserts he did not know or "understand" what FisherBroyles had done in paying the

655 North Central Avenue
Suite 2300
Glendale, CA 91203-1445

LEWIS ROCA

3.5 year maintenance fee until April 2022, almost 7.5 years after the maintenance fee was paid.

98.     Peter Whitford further asserts, in his declaration, that "During the time period of April 2018 to April 2019, or at any other time until April 2022 when new and current registered patent counsel was engaged, neither I nor Meridian received any communication from anyone including prior patent counsel related to, nor was I or Meridian aware of, the obligation to pay a second maintenance fee (the 7.5 year fee)...." *Id.*, ¶10. If Peter Whitford is to be believed, FisherBroyles never sent, or he never received, the U.S. Patent Office's Maintenance Fee Reminder dated November 26, 2018, and the Notice of Patent Expiration dated May 13, 2019, which is highly unlikely and simply not credible or plausible.

99.     Further lending to the implausibility of Peter Whitford's declaration, FisherBroyles publicly disclosed in October 2018 that it employed an "advanced, multi-functionality, web-based system" that "helps the law firm keep up with patent and trademark renewals and helps them meet client deadlines and build client reports."[5]

100.    Peter Whitford's assertions in this declaration to the U.S. Patent Office, therefore, are implausible and not credible at least because: (1) according to Peter Whitford's sworn declaration, his mailing address did not change until February 2019, well after the 7.5 year maintenance fee for the '622 patent was due and the '622 patent had expired and two relevant notices were sent to FisherBroyles and, presumably, forwarded or communicated to Peter Whitford at this longstanding address; (2) Peter Whitford must have been in regular communication with his patent attorney, Rachel Huffstetler (initially as a solo practitioner and later

---

[5]     https://www.anaqua.com/resource/fisherbroyles-unifies-remote-workforce-anaqua/ (accessed December 14, 2023).

655 North Central Avenue
Suite 2300
Glendale, CA 91203-1445

LEWIS ROCA

as a member of FisherBroyles)[6], while he resided at this address because the substantive prosecution of the '622 patent occurred between May 2010 and February 2011; (3) that FisherBroyles, a sophisticated law firm that had employed an advanced communication system for alerting clients of patent maintenance fees, purportedly failed to communicate with him in any way regarding maintenance fees, in spite of FisherBroyles paying the 3.5 year maintenance fee and receiving the Maintenance Fee Reminder on or around November 26, 2018 and the Notice of Patent Expiration on or around May 13, 2019; and (4) the assertion requires acceptance of the purported fact that Peter Whitford, a named inventor on numerous patents, and a sophisticated business person, purportedly had no knowledge whatsoever that maintenance fees were owed on U.S. patents.

101.    Similar to the '622 patent, the '866 patent expired on July 11, 2020, after payment of the 3.5 year maintenance fee (on December 23, 2015) but non-payment of the 7.5 year maintenance fee.  Peter Whitford also retained the law firm of FisherBroyles, LLP, and in particular, the same patent practitioner, Rachel Huffstetler, to prosecute the '866 patent.

102.    Further similar to the '622 patent, FisherBroyles would have received the Maintenance Fee Reminder mailed by the U.S. Patent Office on March 2, 2020, and, presumably, would have forwarded it or communicated its content to Peter Whitford, yet the 7.5 year maintenance fee was not paid.  *See* Exhibit H ("Documents & transaction history of the '866 patent as downloaded from the U.S. Patent Office's Patent Center online system"). This is despite the same law

---

[6] Peter Whitford originally retained Rachel Huffstetler to prosecute the '622 patent and subsequently retained FisherBroyles on April 2, 2012.  However, the same practitioner—Rachel Huffstetler—filed the Power of Attorney appointing FisherBroyles as Peter Whitford's counsel.  Thus, there was continuity in representation because Rachel Huffstetler joined FisherBroyles and brought Peter Whitford along as a firm client.

firm having paid the 3.5 year maintenance fee without instruction from Peter Whitford.

103.    Further, FisherBroyles would have received the Notice of Patent Expiration mailed by the U.S. Patent Office on August 17, 2020, and presumably, would have forwarded it or communicated its content to Peter Whitford. *See* Exhibit H.

104.    Peter Whitford filed a Petition to Revive the '866 patent on April 29, 2022, asserting that "the delay in payment of the maintenance fee for this patent was unintentional," but because the Petition to Revive was filed within two years of the expiration of the '866 patent, a separate declaration was not required.  A true and correct copy of the '866 patent Petition to Revive is attached hereto as Exhibit I.

105.    Around this same time period, Peter Whitford filed another patent application that eventually matured into U.S. Patent No. 7,937,787, titled "Wall Bed Assembly."  This patent is unrelated to the subject matter of this lawsuit.  The same situation occurred with this patent as did with the '622 patent and the '866 patent.  Specifically, Peter Whiteford retained FisherBroyles to prosecute this application, the 3.5 year maintenance fee payment was paid on October 15, 2014, but the 7.5 year maintenance fee was not paid and this patent expired on May 11, 2019.

106.    Thus, Peter Whitford, and specifically his law firm of FisherBroyles, paid the 3.5 year maintenance fees for *three* patent applications between September 3, 2014 and December 23, 2015, yet, according to Peter Whitford's sworn declaration, he was purportedly unaware of his obligation to pay maintenance fees to maintain patents.  Further, Peter Whitford strategically sought to revive only two patents, which are now the same two patents at issue in this lawsuit, leaving U.S. 7,937,787 expired.  Peter Whitford, therefore, only sought to revive the two patents alleged in this lawsuit, and he only sought to revive these

655 North Central Avenue
Suite 2300
Glendale, CA 91203-1445

LEWIS ROCA

two patents *after* the accused product first came on to the market and after they had gained recognition and market share, giving these two patents perceived economic value.

107.    Additionally, on July 29, 2019, Peter Whitford retained a different patent practitioner, Michael O'Brien, to file U.S. Provisional Patent Application No. 62/880,012 (the "'012 provisional application").  A true and correct copy of the documents filed with the U.S. Patent Office on July 29, 2019, are attached hereto as Exhibit J[7].  Paragraph [0002] of the specification of the '012 provisional application states:

> [0002]      Prior to embodiments of the disclosed invention, a portable perimeter defense system was disclosed in U.S. Patent 7,918,622 issued to Whitford and in U.S. Patent 8,215,866 also issued to Whitford.  Devices with the technology in these patents are sold by Meridian Rapid Defense Group LLC under the trade name ARCHER 750™.  The entirety of these references is incorporated by reference.

108.    Thereafter, on September 29, 2020, Peter Whitford filed U.S. Patent Application No. 17/035,704 (the "'704 application"), which claimed the benefit of the '012 provisional application.  Paragraph [0003] of the specification of the '704 application mirrored paragraph [0002] of the '012 provisional application except for the ™ being replaced by ®.

109.    Thus, at the very time his '622 patent and '866 patent were expiring due to non-payment of the 7.5 year maintenance fee, Peter Whitford was actively engaged in the preparation and filing the '012 provisional application and the '074 application, both of which expressly incorporated the subject matter of the '622

---

[7] The drawings filed on July 29, 2019, are omitted from Exhibit J due to their substantive size.

655 North Central Avenue
Suite 2300
Glendale, CA 91203-1445

LEWIS ROCA

and '866 patents.[8]  On information and belief, Peter Whitford would have been made aware of the expiration of the '622 patent and the upcoming 7.5 year maintenance fee due date in the '866 patent by his new patent counsel, Michael O'Brien.

110.  Accordingly, based on the above information, on information and belief, Peter Whitford is a sophisticated inventor having been awarded three patents and having filed more patent applications while being represented by reputable patent counsel.  As such, on information and belief Peter Whitford was aware of his obligation to pay maintenance fees to maintain his patents, including the 3.5 year and 7.5 year maintenance fees but intentionally declined to pay, or have FisherBroyles pay, the 7.5 year maintenance fee in both Asserted Patents.  As explained above, inextricably, Peter Whitford paid (or had paid) the 3.5 year maintenance fee in three of his patents, then failed to pay the 7.5 year maintenance fee in each of those same three patents, yet only revived the two patents at issue in this lawsuit and having perceived economic value.

111.  Further, during the time period the patents asserted in this lawsuit were expiring for non-payment of the 7.5 year maintenance fee and while related Notices were being sent to FisherBroyles on his behalf, Peter Whitford was actively engaged in preparing and filing new patent applications based on the two patents asserted in this action.  In spite of these facts, Peter Whitford declared, under penalty of perjury to the U.S. Patent Office, that he was not aware of his obligation to pay the 7.5 year maintenance fee and that he was not made aware of the expiration of the '622 patent until April 6, 2022, three years after the filing the '012 provisional application that purported to disclose advancements over the '622 patent.  In the '866 patent, Peter Whitford, through his new patent counsel, declared

---

[8] The '622 patent expired on April 6, 2019, the '012 provisional patent was filed on July 29, 2019, the '866 patent expired on July 11, 2020, and the '704 application was filed on September 29, 2020.

to the U.S. Patent Office that "The delay in payment of the maintenance fee for [the '866] patent was unintentional.

112.    On information on belief and based on the above-described facts and pattern of behavior, Peter Whitford's statements made to the U.S. Patent Office in his declaration dated April 29, 2022 in the '622 patent and in the declaration submitted on his behalf on April 29, 2022 in the '866 patent were false at least because the entire delay in payment of the 7.5 year maintenance fee for both the '622 and '866 patents was not unintentional.   On information and belief, Peter Whitford was made aware of his obligation to pay the 7.5 year maintenance fee in both Asserted Patents by his law firm, FisherBroyles and/by his other patent counsel, Michael O'Brien, and is a sophisticated inventor aware of his obligation to pay maintenance fees, yet he chose to not pay the 7.5 year maintenance fees in both Asserted Patents, which would render his statements to the U.S. Patent Office false.  On information and belief, Peter Whitford was made aware of the expiration of the Asserted Patents by his law firm, FisherBroyles, or by his other patent counsel, Michael O'Brien, yet he chose to not immediately petition to revive the same, which would further render his statements to the U.S. Patent Office false. *See* Exhibit G ("For example, a statement that the delay in payment of the maintenance fee was unintentional would not be proper when the patentee becomes aware of an unintentional failure to timely pay the maintenance fee and then intentionally delays filing a petition for reinstatement of the patent....").

113.    Had the U.S. Patent Office known that Peter Whitford intentionally allowed the Asserted Patents to expire and/or intentionally delayed petitioning to revive the Asserted Patents after discovery of their expiration, it would not have revived them.  Thus, Peter Whitford's misrepresentations and/or omissions to the U.S. Patent Office in his petitions to revive the Asserted Patents and in his declaration in support thereof were material to patentability, or to continued enforceability, of the Asserted Patents.

655 North Central Avenue
Suite 2300
Glendale, CA 91203-1445

LEWIS ROCA

114.    Accordingly, Plaintiff should be precluded from asserting any claim of the Asserted Patents.

### TENTH AFFIRMATIVE DEFENSE

### (Equitable Intervening Rights)

115.    The '622 patent expired on April 6, 2019, and was not reinstated until October 11, 2022.    During this three-and-a-half-year period, Delta invested substantial capital and effort into the sales, marketing, manufacture, publicity, and improvements to its TB100 bollard.

116.    The '866 patent expired on July 10, 2020, and was not reinstated until June 2, 2022.  During this nearly two-year period, Delta invested substantial capital and effort into the sales, marketing, manufacture, publicity, and improvements to its TB100 bollard.

117.    In view of these efforts and investments made by Delta regarding its TB100 bollard during these time periods when the Asserted Patents were lapsed, Plaintiff should be precluded from asserting any claim of the '622 patent against Delta accruing after its lapse on April 6, 2019 and be precluded from asserting any claim of the '866 patent against Delta occurring after its lapse on July 10, 2020.

### DELTA'S FOURTH AMENDED COUNTERCLAIMS

Defendant and Counterclaimant Delta Scientific Corporation ("Delta") asserts its amended counterclaims against Counterdefendant Meridian Rapid Defense Group LLC ("Meridian") and Peter D. Whitford ("Whitford") as follows:

### PARTIES

1.    Delta Scientific Corporation is a California Corporation with its headquarters at 40355 Delta Lane, Palmdale, California 93551.

2.    Upon information and belief, Meridian Rapid Defense Group is a Delaware limited liability company with its principal place of business at 177 E. Colorado Blvd., Suite 200, Pasadena, California 91105.

3.      Upon information and belief, Peter D. Whitford is an individual who resides in this District.

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction under 38 U.S.C. § 1331 and 1338(a) because this complaint arises under the federal patent laws of the United States, 35 U.S.C. § 1 et seq.

5.      Meridian is subject to personal jurisdiction in this District arising out of the Complaint that Meridian filed in this Court, and Meridian's and Mr. Whitford's significant contacts with the forum.  Upon information and belief, Meridian and Mr. Whitford have systematic and continuous contacts with this District, regularly transacts business and/or resides in this District, maintain a regular and established place of business in this District, and regularly and purposefully avail themselves of the benefits of this District.

6.      Venue is proper in this judicial district under 28 U.S.C. § 1391.

## DELTA SCIENTIFIC AND ITS PRODUCTS

7.      Delta is a global leader in high security bollards and vehicle barriers. The vast majority of Delta's products are permanently installed vehicle barriers, such as those that are buried in the ground.  Such large and complicated barrier systems are designed to stop high-mass vehicles.

8.      Delta has been engineering and manufacturing vehicle access control equipment and selling its products worldwide since 1974. Delta is a well-known and well-established supplier of barrier systems with a long and successful track record of succeeding in barrier markets for more permanent barrier structures. On information and belief, when Meridian first learned that Delta was coming to market with portable barrier products that directly competed with Meridian's portable perimeter defense barriers, Meridian began their unlawful attempts to thwart Delta's entry into and/or expansion in that market given Delta's long track record of success in providing vehicle access control equipment.

9.    Delta, however, recognized a need in the market for a competitive lower-cost, highly portable barrier that can be rapidly positioned on most surfaces, including on hard surfaces such as asphalt, without requiring an anchoring system, in order to prevent vehicles from entering secure areas and which block access to venues and open spaces where vehicles can be used as weapons against pedestrians ("portable perimeter defense barrier market" or "relevant product market"). Hence, Delta developed its TB100 bollard product.   Delta was granted two U.S. utility patents and one U.S. design patent covering the TB100 product.[9] The TB100 product is a portable perimeter defense barrier and/or system that can be rapidly positioned on most surfaces, including on hard surfaces such as asphalt, without requiring an anchoring system, in order to prevent vehicles from entering secure areas and which blocks access to venues and open spaces where vehicles can be used as weapons against pedestrians.

10.    As is necessary with all serious entrants into the field of vehicle barriers, Delta spent significant capital to design, develop, test, and certify its TB100 bollard. Indeed, to be considered a true vehicle barrier, certain industry-standard tests must be conducted and the product certified based on its ability to stop different classes of vehicles. These high barriers to entry, and the necessary strong base of institutional knowledge to design effective vehicle barriers, drive up the cost of introducing new vehicle barriers and limit the overall number of competitors in the field in a time when vehicular attacks are increasing worldwide.

**JEFFREY FROMM'S RAPID DEPLOYMENT**
**BARRIER (RDB) INVENTION**

11.    On information and belief, Jeffrey Fromm conceived the rapid deployment barrier device described and claimed in Plaintiff's Asserted Patents.

---

[9] U.S. Patent Nos. 10,407,852 and 10,941,531 and U.S. Design Patent No. 903,906.

655 North Central Avenue
Suite 2300
Glendale, CA 91203-1445

LEWIS ROCA

Plaintiff's founder and CEO, Peter D. Whitford, appears to have fraudulently named himself as the sole inventor on both of the Asserted Patents.

12.   On information and belief, Jeffrey Fromm had many years of experience in the security field.  He was a correctional officer, deputy sheriff, and a United States Marshal guard providing court security and transportation of federal prisoners. Mr. Fromm worked as a hostage negotiator and was certified in use of the AR 15, 12 gauge shotgun, and 9 millimeter pistol. Following the tragedy of September 11th, Mr. Fromm became very interested in anti-terrorist security.

13.   In or about 2005, Mr. Fromm formed his own company, Fromm Barriers, Inc. ("Fromm Barriers"), a Pennsylvania-based company that designed and built tactical/anti-terrorism barrier systems. Fromm Barriers also provided training regarding field tactical deployment of their RDB barriers. Mr. Fromm designed, developed, and received a patent for his inventions related to barrier devices capable of rapid deployment and assembly to form a barrier wall, U.S. Patent No. 7,494,112.

**FROMM BARRIERS SEEKS FUNDING FROM INVESTOR PETER WHITFORD AND HIS BRAND DEVELOPMENT COMPANY WHITMARKS**

14.   On information and belief, in 2005, Mr. Whitford's company, Whitmarks Corporation ("Whitmarks"), provided three services, brand development, brand communication, and brand licensing.

15.   On information and belief, Mr. Whitford's educational background is exclusively in marketing.  Mr. Whitford has an undergraduate degree and graduate degree in marketing.

16.   On information and belief, in 2005, neither Mr. Whitford, an Australian citizen, nor his company Whitmarks, had any experience or background in security systems or the design or development of barrier devices.  Mr. Whitford instead had experience overseeing specialty apparel companies, such as

Country Road (apparel company), Structure (apparel company), Wet Seal, Inc., (a leading specialty teen retailer of fashionable and contemporary apparel and accessory items), and the Disney retail stores.

17.    As explained by Mr. Whitford in his declaration submitted in *Meridian Rapid Defense Group LLC v. Fromm Barriers, Inc.*, Case No.: CV 07-3201-ODW(RCx)  (C.D. Cal. Sept. 14, 2007)[10], in or around 2006, Mr. Whitford was approached by Joel Mayer on behalf of Fromm Barriers to provide financing to Fromm Barriers, Inc. and, in particular, to market Fromm Barriers' RDB 54 barrier, which was invented by Jeffrey Fromm.

18.    According to Mr. Whitford, prior to September 2006, he was informed as to the design and operating principles of Fromm Barriers' RDB 54 barrier by at least Howard Kaufman and Mr. Fromm.  Further, Mr. Whitford saw at least detailed photographs of the RDB 54 barrier, including those shown in Exhibit A to Mr. Whitford's declaration (hereinafter referred to as the "RDB 54 one-sheet"). These images and description of the Fromm RDB 54 barrier with wheels clearly shows that the barrier includes wheels, demonstrating that it can be moved using the wheels, and would not need to be lifted to move it. In fact, the Fromm RDB 54 one-sheet (which Whitford failed to disclose to the USPTO) explains that the Fromm barriers are "[l]ightweight and easy to deploy" and is an "interlocking barrier system that can be rapidly off loaded and deployed *by one person*" (emphasis added).  It is further described as "Easy to Deploy" because "[t]he RDB 54 is the only barrier system in the world that can be deployed and reloaded by individual members of a tactical unit, male or female.  Neither cranes nor heavy equipment are required."

19.    At a September 13, 2006, meeting between, *inter alia*, Mr. Fromm and Mr. Whitford, the RDB 54 barrier was discussed and the meeting minutes, attached

---

[10] A copy of this declaration and attachments is attached hereto as Exhibit K.

655 North Central Avenue
Suite 2300
Glendale, CA 91203-1445

LEWIS ROCA

1    to Exhibit B to Mr. Whitford's declaration, indicate that "Patents" were also

2    discussed.  This is apparently a reference to Mr. Fromm's then-pending patent

3    application that would eventually mature into U.S. Patent No. 7,494,112.  Indeed,

4    the pre-grant publication of Fromm's '112 Patent did not publish until November

5    29, 2007, as US 2007/0272911 A1, over a year after Mr. Fromm apparently

6    described his pending patent application to Mr. Whitford.

7        20.    Despite these negotiations and substantial disclosure of information

8    from Fromm to Mr. Whitford, Fromm Barriers and Mr. Whitford never came to

9    any agreement. Mr. Whitford stated in his declaration "[i]t became clear to me by

10   December, 2006, that for various reasons, the parties would not be able to come to

11   an agreement."

**MR. WHITFORD IMMEDIATELY SEEKS PATENT PROTECTION FOR**

**FROMM'S RAPID DEPLOYMENT BARRIERS AND MR. WHITFORD**

**FALSELY CLAIMS TO BE SOLE INVENTOR**

15       21.    On May 7, 2007, only a few months after determining he could not

16   come to any agreement to invest in Fromm's company, armed with only marketing

17   degrees, and with no apparent independent prior experience involving security

18   barriers (except what he had learned from meeting with Fromm), Mr. Whitford

19   filed provisional patent application No. 60/928,332, which eventually led to the

20   issuance of Plaintiff's Asserted Patents. Mr. Whitford fraudulently named himself

21   as the sole inventor.

22       22.    The similarities between the Asserted Patents and Mr. Fromm's RDB

23   54 barrier/Fromm's patent, both of which were described and disclosed to

24   Mr. Whitford prior to their general public disclosure, show that Mr. Fromm

25   conceived what later became Mr. Whitford's patented invention and, at the very

26   least, is a co-inventor of the Asserted Patents.  Based on Mr. Whitford's 2007

27   declaration and a visual comparison between Mr. Fromm's RDB 54 barrier and

28   Mr. Whitford's patented barrier (below), the subject matter of the asserted patents

is substantially based on discoveries, advances, and innovations by Mr. Fromm in his RDB 54 barrier. By misrepresenting himself as the sole inventor of the asserted patents, Mr. Whitford committed inequitable conduct in procuring both Asserted Patents, and the Asserted Patents are both invalid.

 

**Mr. Fromm's RDB 54 Barrier**      **Mr. Whitford's Patented Barrier**

23.    It appears, for example, that Mr. Fromm invented, at least, the general structure of what would later become the subject of Mr. Whitford's Asserted Patents, including at least:

- a mobile or portable barrier that provides protection against both vehicular incursions and active shooter situations;

- a modular barrier that can be connected to other barriers having the same or similar configuration to provide a customizable barrier solution;

- a base plate;

- an upright plate extending perpendicular to the base plate;

- the upright plate being designed and configured to protect against munitions;

- a brace extending between a rear surface of the upright plate and the base plate;

655 North Central Avenue
Suite 2300
Glendale, CA 91203-1445

LEWIS ROCA

- anchors or other members protruding onto or into the ground from the base plate to improve resistance to horizontal movement; and

- a wheel assembly that can be engaged to allow the barrier to be easily moved or disengaged to convert the barrier to an anti-vehicle barrier.

24.    It is unclear at this point what inventive contributions, if any at all, can be properly attributed to Mr. Whitford.  Mr. Whitford, therefore, certainly had no proper basis to represent to the USPTO that Mr. Whitford was the **sole** inventor for the Asserted Patents. For at least these reasons, the inventorship of the Asserted Patents is false due to the non-joinder of Mr. Jeffrey Fromm, rendering both of the Asserted Patents invalid under 35 U.S.C. § 102(f).

### MR. WHITFORD ENGAGES IN INEQUITABLE CONDUCT BY FAILING TO DISCLOSE MATERIAL PRIOR ART AND BY MISCHARACTERIZING PRIOR ART

25.    Plaintiff's founder and CEO, Peter D. Whitford, is the sole listed inventor on both of the Asserted Patents.  *See* Exhibit A (Declaration of Peter D. Whitford, dated April 29, 2022), ¶6 ("I am the founder and have been the principal and majority owner of Meridian Rapid Defense Group LLC [] since it was formed ... on October 17, 2006.").

26.    According to Plaintiff's webpage at www.betterbarriers.com, as it was captured by the Internet Archive's Wayback Machine on August 3, 2009, a true and correct copy of which is attached hereto as Exhibit B, Plaintiff had publicly disclosed and was offering for sale and/or selling in the United States a product it called "Archer 500" as of December 22, 2008.  A true and correct copy of a PDF printout describing Plaintiff's Archer 500 barrier, as archived by the Internet Archive's Wayback Machine, is attached hereto as Exhibit C.  A true and correct copy of a schematic drawing of Plaintiff's Archer 500 barrier is attached hereto as Exhibit D.

27.    Peter Whitford, as the founder and CEO of Plaintiff, would have been aware of and deeply involved with the design, testing, launch, public disclosures, offers for sale, and any sales of the Archer 500 barrier.  Indeed, the Archer 500 was one of Plaintiff's first commercially available barriers, making it particularly notable for Peter Whitford.  Further, Plaintiff offers very few products for sale, making any publicly disclosed product notable.

28.    Plaintiff's Archer 500 barrier differs from the barrier disclosed in the '622 patent.  Notably, in the barrier disclosed in the '622 patent, distal ends of the side plates (28) are positioned distant from, or are spaced from, the fore edge of the base plate (2).  On the other hand, the Archer 500 barrier is truncated compared to the barrier disclosed in the '622 patent such that the side plates and the base plate present a continuous or coextensive fore edge.  *See also* Exhibit C ("Compared to the Archer 750, the Archer 500 is lighter and shorting in length....").  In other words, the distal ends of the side plates are co-planar or coextensive with the base plate fore edge.  A comparison between Figure 15 of the '622 patent and the Archer 500 barrier is provided below with the relevant portions of each picture highlighted by a red box.

655 North Central Avenue
Suite 2300
Glendale, CA 91203-1445

LEWIS ROCA

655 North Central Avenue
Suite 2300
Glendale, CA 91203-1445

LEWIS ☐ ROCA

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



*FIG.* 15



Exhibit C (annotated)



Exhibit D (annotated)

29.    The '622 patent also fails to disclose, in the specification (i.e., in the textual description), the continuous or coextensive side plate / base plate fore edge arrangement present in the Archer 500 barrier.   Thus, at least the fore edge configuration of Archer 500 barrier was not disclosed in the '622 patent.

30.    According to Plaintiff's own website, the Archer 500 barrier was publicly disclosed and offered for sale in the United States at least as early as December 22, 2008, more than one year before the July 21, 2010, filing date of the '866 patent[11]; thus, Plaintiff's Archer 500 barrier is prior art to at least claim 49 of the '866 patent under pre-AIA 35 U.S.C. § 102(b), which states, in relevant part, "the invention was ... described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of application for patent in the United States".   Peter Whitford, as the sole inventor of

---

[11] As explained above and reasserted here, at least asserted claim 49 of the '866 Patent is not entitled to the benefit of filing date of the '622 Patent.

655 North Central Avenue
Suite 2300
Glendale, CA 91203-1445

LEWIS ROCA

both Asserted Patents, would have known that the new subject matter recited in claim 49 of the '866 patent, that is, the subject matter not disclosed in the '622 patent, is "wherein said fore edge, facing the impact direction, comprises a vehicle engaging interface in the form of a nonlinear configuration extending along a portion of said base plate fore edge wherein, under sufficient impact forces, said modular barrier pivots about said aft edge and said fore edge engages an impacting vehicle." Despite this knowledge, Peter Whitford failed to disclose the prior public disclosure and offer for sale and/or sale in the United States of Plaintiff's Archer 500 barrier, which includes the vehicle engaging interface as recited in claim 49 of the '866 patent, to the U.S. Patent office during prosecution of the '866 patent.

31.    On July 21, 2010, and in connection with the filing of the continuation-in-part application that would mature into the '866 patent, Peter Whitford executed a declaration in which he expressly acknowledged, under penalty of perjury, "I/we acknowledge the duty to disclose to the United States Patent and Trademark Office all information known to me/us to be material to patentability as defined in 37 CFR 1.56, **including for continuation-in-part applications, material information which became available between the filing date of the prior application and the national or PCT International filing date of the continuation-in-part application**." (emphasis added). A true and correct copy of Peter Whitford's July 21, 2010, declaration, as downloaded from the file wrapper of the '866 patent available at the U.S. Patent Office's website, is attached hereto as Exhibit E.

32.    Despite Peter Whitford's express acknowledgement of his duty to disclose material information that become available between the filing date of the '622 patent and the filing date of the '866 patent, which includes the prior public disclosure and offer for sale and/or sale in the United States of the Archer 500 barrier, Peter Whitford failed to disclose the existence of the Archer 500 barrier to the U.S. Patent office. Indeed, Peter Whitford did not file a single information

disclosure statement during the prosecution of the '866 patent despite the Archer 500 barrier being actually reduced to practice and offered for sale and/or sold prior to the filing date of the '866 patent.

33.    The Archer 500 barrier is but-for material to the '866 patent because it anticipates at least asserted claim 49 of the '866 patent, which recites:

49.    A portable perimeter defense system for stopping movement of a vehicle in an impact direction, the defense system comprising:
        a first modular barrier;
        said modular barrier comprising an upright plate and a base plate for positioning on a ground surface wherein said upright plate extends generally perpendicular to said base plate and a wheel assembly pivotally attached to said base plate such that said wheel assembly pivots between engaged and disengaged positions;
        said base plate having an aft and fore edge wherein said fore edge, facing the impact direction, comprises a vehicle engaging interface in the form of a nonlinear configuration extending along a portion of said base plate fore edge wherein, under sufficient impact forces, said modular barrier pivots about said aft edge and said fore edge engages an impacting vehicle.

34.    In particular, to the extent the preamble of claim 49 is limiting, the Archer 500 barrier is a portable perimeter defense system for stopping movement of a vehicle in an impact direction. *See* Exhibit C ("[t]he Archer 500 ... offers exceptional vehicle stopping capabilities" and is "Rapidly deployable" and "Two person portable").

35.    The Archer 500, as shown and described in Exhibits C and D (annotated figures of which are provided below), includes a first modular barrier comprising an upright plate and a base plate for positioning on a ground surface. Further, the upright plate is shown as extending perpendicular to the base plate, which would include "generally perpendicular" as recited. Exhibit C describes the Archer 500 barrier having a "[m]odular design" because it can be connected to other Archer 500 barriers. *See id*. ("Deployment formations for the Archer 500 barrier include: ... Interconnected sets of 2 – 4 units"). In the below picture from

Exhibit C, the base plate is shown as being positioned on the ground surface, and the upright plate extends perpendicular, to the base plate.



Exhibit C (annotated)



Exhibit D (annotated)

655 North Central Avenue
Suite 2300
Glendale, CA 91203-1445

LEWIS ROCA

125542953.3

36.    The Archer 500 barrier also includes a wheel assembly pivotally attached to the base plate such that the wheel assembly pivots between engaged and disengaged positions.  In the below annotated picture from Exhibit C, the wheel assembly is in the engaged position, that is, the wheel assembly is pinned in the lower of the two pinholes.  As can be seen, the wheel assembly can also be pivoted about its axis pin to the disengaged position, that is, when the wheel assembly is pinned in the upper of the two pinholes.



37.    The same wheel assembly configuration present on the Archer 500 barrier was disclosed in the '622 patent.  Figure 11 of the '866 patent is reproduced below along with an excerpt from Exhibit D showing overlapping features in the wheel assembly.

655 North Central Avenue
Suite 2300
Glendale, CA 91203-1445

LEWIS ROCA

655 North Central Avenue
Suite 2300
Glendale, CA 91203-1445

LEWIS ROCA

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28





38.    The base plate of the Archer 500 barrier has an aft and fore edge as shown in the below annotated figures of the Archer 500 barrier.  The fore edge,

which faces the impact direction, includes a vehicle engaging interface in the form of a nonlinear configuration extending along a portion of the base plate fore edge. Additionally, under sufficient impact forces, the Archer 500 barrier would pivot about the aft edge and the fore edge would engage the impacting vehicle.



Exhibit C (annotated)



Exhibit D (annotated)

39.    In particular, the base plate fore edge has a shallow "U" shape configuration because the side plates and the base plate are welded together to

655 North Central Avenue
Suite 2300
Glendale, CA 91203-1445

LEWIS ROCA

1  present a single, continuous fore edge.  The fore edge of the base plate of the Archer
2  500 barrier is nonlinear along a portion thereof either: (1) where the fore edge
3  transitions from horizonal to vertical; and/or (2) at its vertically extending portion,
4  which is nonlinear when compared to the horizontal portion of the fore edge.



Exhibit C (annotated)



Exhibit D (annotated)

40.    When a vehicle impacts the upright plate, the Archer 500 would pivot
about the aft edge, causing the fore edge of the base plate as highlighted in the

655 North Central Avenue
Suite 2300
Glendale, CA 91203-1445

LEWIS ROCA

above figures to impact the underside of the impacting vehicle.  In more detail, the vertical portion of the base plate fore edge would contact the impacting vehicle before the horizontal portion of the base plate fore edge.

41.     Accordingly, the Archer 500 brochure and/or the public disclosure and offer for sale and/or sale(s) in the United States of the Archer 500 barrier are but-for material to the '866 patent because, had the Archer 500 barrier been disclosed to the U.S. Patent Office, the U.S. Patent Office would not have allowed at least claim 49 of the '866 patent because it is anticipated by the Archer 500 barrier.

42.     Peter Whitford was aware of the disclosures of the '622 patent and the '866 patent, including the new subject matter added to the '866 patent, by virtue of him being the sole inventor of both patents, was knowledgeable of the Archer 500 barrier by virtue of his position as Plaintiff's founder and CEO, and acknowledged, under penalty of perjury, his duty to disclose "material information which became available between the filing date of the prior application and the national or PCT International filing date of the continuation-in-part application."  Despite his knowledge of the Archer 500 barrier, its materiality to the '866 patent, and his acknowledged duty to disclose the same, upon information and belief, Peter Whitford withheld the existence and public disclosure of the Archer 500 barrier from the U.S. Patent Office with an intent to defraud the U.S. Patent Office. Indeed, the single most reasonable inference to be gleaned from Peter Whitford's knowledge of the '866 patent and the characteristics and configuration of the Archer 500 barrier, and his subsequent failure to disclose this material information to the U.S. Patent Office during prosecution of the '866 patent, is that he intended to deceive the U.S. Patent Office into granting the '866 patent.

43.     In sum, during prosecution of the '866 patent (the "when"), Peter Whitford (the "who") withheld the prior public disclosure and offer for sale and/or sale(s) in the United States of his Archer 500 barrier, which anticipates at least asserted claim 49 of the '866 patent (the "what" and "where").

655 North Central Avenue
Suite 2300
Glendale, CA 91203-1445

LEWIS ROCA

Had Peter Whitford disclosed the prior public disclosure and offer for sale and/or sale(s) in the United States of the Archer 500 barrier to the U.S. Patent Office, the Examiner would have rejected and not allowed at least claim 49 of the '866 patent (the "how" and "why"). Peter Whitford, as the sole inventor of the '866 patent and the prior '622 patent, knew the differences in disclosures between these patents and, as Plaintiff's founder and CEO, knew of its Archer 500 barrier and the public disclosure and offer for sale and/or sale(s) of the same. Peter Whitford also acknowledged, under penalty of perjury, his duty to disclose material information accruing between the filing of the '622 patent and the filing of the '866 patent yet failed to disclose to the U.S. Patent Office the existence of his Archer 500 barrier.

44.    In addition, as explained above, during the 2005 and 2006 timeframe, Mr. Whitford learned and was informed as to the design and operating principles of Fromm Barriers' RDB 54 barrier and saw at least detailed photographs of the RDB 54 barrier, including the RDB 54 barrier one-sheet.

45.    Mr. Whitford has declared under penalty of perjury that the RDB 54 one-sheet was publicly disclosed "on the Fromm Barriers' website" and was publicly circulated "at the Burbank trade show" for the National Tactical Officers Association in September 2006.

46.    Even earlier, during a September 13, 2005, meeting between, *inter alia*, Mr. Fromm and Mr. Whitford, the RDB 54 barrier was discussed and the meeting minutes, attached to Exhibit B to Mr. Whitford's declaration, indicate that "Patents" were also discussed. This is apparently a reference to Mr. Fromm's then-pending patent application that would eventually mature into U.S. Patent No. 7,494,112.

47.    Delta asserts that Fromm Barrier, Inc.'s RDB 54 barrier is prior art to all Asserted Claims under pre-AIA 35 U.S.C. §§ 102(a)[12] and/or 102(b)[13].  Upon information and belief, Fromm Barrier's RDB 54 barrier was publicly disclosed at least as early as September 10, 2006, at the National Tactical Officers Association Conference and Vender Show in Burbank, California, that is, before the earliest possible effective filing date of any claim of the '622 Patent of May 8, 2007.

48.    Delta further asserts that Fromm Barrier, Inc.'s RDB 54 barrier is prior art to the Asserted Claims of the '866 Patent under pre-AIA 35 U.S.C. § 102(b).

49.    Accordingly, the RDB 54 barrier and the RDB barrier one-sheet is but-for material to the Asserted Patents.  Had the RDB 54 barrier one-sheet been disclosed to the U.S. Patent Office, the U.S. Patent Office would not have allowed one or more claims of the Asserted Patents.  Further, the RDB 54 barrier and the RDB 54 barrier is non-cumulative of the Fromm patent, U.S. 7,494,112, considered by the Examiner during prosecution of the Asserted Patents.

50.    First, in the Background of the Invention section of the '622 Patent, Mr. Whitford described Fromm's patent as follows:

> For example, U.S. Patent Application Publication No. US 2007/0272911 A1 (hereinafter the '911 application) discloses a markedly different barrier system. For example, the barrier system disclosed in the '911 application requires at least four people to install each barrier. Four people are required because the heavy, individual barriers according to the '911 application must be manually lifted to be positioned. The '911 application discloses interlocked adjacent barriers forming single rows of a desired length which may then be arranged in a "split V" configuration. The amount of physical exertion required to install the barrier system according to the '911 application is excessive and time consuming, which is disadvantageous in volatile environments wherein circumstances necessitate expedited installation of a defense system or wherein changing conditions warrant

[12] For those claims entitled to claim priority to U.S. Provisional Patent Application No. 60/928,332.

[13] For those claims not entitled to claim priority to U.S. Provisional Patent Application No. 60/928,332.

655 North Central Avenue
Suite 2300
Glendale, CA 91203-1445

LEWIS ROCA

movement or other reconfiguration of a defense system. The '911 application does not provide a defense system with cooperating rows of barriers for increased strength and, due to its configuration, it is not modular and not capable of numerous configurations for changing threatening conditions and/or for alterations as part of a strategic deterrent system. Moreover, the barriers according to the '911 application do not provide the level of protection from munitions afforded by the portable perimeter defense system according to the present invention.

51.    The RDB 54 barrier, as disclosed at the Burbank Trade Show and as described in the one-sheet, includes a wheel assembly that allows the barrier to be "deployed by one person."  The RDB 54 barrier one sheet, which Mr. Whitford was in possession of but withheld from the examiner, states that the RDB 54 barrier has "360° traversing wheels mounted on the base plate of each barrier, the wheels allow the barrier to be maneuvered easily by one person from location to location."

52.    Fromm's patent that was considered by the examiner did not disclose wheels.  On information and belief, Mr. Whitford exploited this lack of disclosure in Fromm's patent to advance his own patent application despite his personal knowledge that the commercial embodiment of Fromm's patent, the RDB 54 barrier, included wheels that made it movable by a single person.  Thus, these withheld references are non-cumulative of the Fromm patents disclosed to and considered by the examiner in prosecuting the '622 patent.

53.    Further, during prosecution of the '622 patent, according to Mr. Whitford's attorney, the examiner allowed at least as-filed claim 36 because it recited a "wheel attachment which pivotably secures the wheel to the base plate such that the wheel may be moved from an engaged to a disengaged position." Had the examiner been made aware of Fromm's RDB 54 barrier and the RDB 54 barrier one-sheet, which discloses this very wheel attachment concept, these claims would not have been allowed.  Thus, these withheld references are but-for material to at least one claim of the '622 patent.

655 North Central Avenue
Suite 2300
Glendale, CA 91203-1445

LEWIS ROCA

54.    Peter Whitford was aware of the disclosures of the '622 patent and the '866 patent, by virtue of him being the purported sole named inventor of both patents, was knowledgeable of the RDB 54 barrier one-sheet as explained above, and Mr. Whitford acknowledged, under penalty of perjury, his duty to disclose material information.  Despite his knowledge of the RDB 54 barrier and the RDB 54 barrier one-sheet, its materiality to the Asserted Patents, and his acknowledged duty to disclose the same, upon information and belief, Peter Whitford withheld the existence and public disclosure of the RDB 54 barrier and RDB 54 barrier one-sheet from the U.S. Patent Office with an intent to defraud the U.S. Patent Office. Indeed, the single most reasonable inference to be gleaned from Peter Whitford's knowledge of the Asserted Patents and the characteristics and configuration of the RDB barrier and RDB 54 barrier one-sheet, and his subsequent failure to disclose this material information to the U.S. Patent Office during prosecution of the Asserted Patents, is that he intended to deceive the U.S. Patent Office into granting the Asserted Patents.

55.    In sum, during prosecution of the Asserted Patents (the "when"), Peter Whitford (the "who") withheld the prior public disclosure and/or offer for sale and/or sale(s) in the RDB 54 barrier, which anticipates one or more claims of the Asserted Patents (the "what" and "where").  Had Peter Whitford disclosed the prior public disclosure and/or offer for sale and/or sale(s) in the United States of the RDB 54 barrier to the U.S. Patent Office, the Examiner would have rejected and not allowed at least one claim of the Asserted Patents (the "how" and "why").

56.    Accordingly, Plaintiff should be barred from enforcing any claim of the Asserted Patents.

**WHITFORD SEPARATELY ENGAGES IN INEQUITABLE CONDUCT BY MAKING MATERIAL MISREPRESENTATIONS TO THE UPSTO IN ORDER TO REVIVE THE ASSERTED PATENTS**

57.    A Notice of Allowance was mailed by the U.S. Patent Office in the '622 patent on November 19, 2010.   That Notice states, in bold letters, "IMPORTANT REMINDER: Utility patents issuing on applications filed on or after Dec. 12, 1980 may require payment of maintenance fees.  It is patentee's responsibility to ensure timely payment of maintenance fees when due."

58.    After payment of the issue fee, the '622 patent issued on April 5, 2011. Thus, the patent owner—Peter Whitford at all relevant times—had an obligation to pay maintenance fees to the U.S. Patent Office on the 3.5 year, 7.5 year, and 11.5 year anniversary of this issue date to keep the '622 patent in force, that is, to prevent the '622 patent from expiring.

59.    It is standard practice among patent practitioners to inform and explain to inventors and patentees their duty to pay maintenance fees.  To assist with this duty and obligation, the U.S. Patent Office will mail a Maintenance Fee Reminder to the address of record once a maintenance fee payment due date is missed and, if necessary, mails a Notice of Patent Expiration to the address of record after a patent expires for failure to pay a maintenance fee.  *See* MPEP § 2575.

60.    The 3.5 year maintenance fee for the '622 patent was due on October 6, 2014, but was paid early, on September 3, 2014.

61.    The 7.5 year maintenance fee for the '622 patent was due on October 5, 2018, but was not paid prior to the due date.  Accordingly, as is its standard practice, the U.S. Patent Office mailed a Maintenance Fee Reminder to the attorney of record, FisherBroyles, LLP ("FisherBroyles") on November 26, 2018.  *See* Exhibit F (Documents & transaction history of the '622 patent as downloaded from the U.S. Patent Office's Patent Center online system).  It is not only standard practice but can be negligent for a patent practitioner to fail to

forward or at least inform its clients of such notices and allow patents to expire without receiving authorization from a client. *See* Final Order, U.S. Patent Office Disciplinary Proceeding No. D2012-30, dated April 12, 2013 (finding violations of 37 C.F.R. § 10.77(c) "by allowing patents to expire for not timely paying maintenance fees" and 37 C.F.R. § 10.23(a), (b), and (c)(8) "by not informing clients of important Office correspondence").

62.    Despite this Notice, Peter Whitford did not pay (or have paid) the 7.5 year maintenance fee within the six-month grace period after the due date, which ended on April 5, 2019. Thus, the '622 patent expired on April 6, 2019, and as is its standard practice, the U.S. Patent Office mailed a Notice of Patent Expiration on May 13, 2019. *See* Exhibit F. On information and belief, Peter Whitford's patent counsel, FisherBroyles, would have forwarded or at least informed him of this Notice of Patent Expiration.

63.    During the three-year time period that the '622 patent was expired and the two-year time period that the '866 patent was expired, Delta's accused TB100 bollard gained popularity and market share.

64.    Over three years after the '622 patent expired, on April 29, 2022, Peter Whitford filed a Petition to Accept Unintentionally Delayed Payment of Maintenance Fee In An Expired Patent (the "'622 patent Petition to Revive"). A true and correct copy of the '622 patent Petition to Revive is attached hereto as Exhibit G, and a true and correct copy of Peter Whitford's declaration submitted in support of the '622 patent Petition to Revive is attached as Exhibit A (the "'622 patent Revival Declaration"). Because the '622 patent Petition to Revive was filed more than two years after the expiration of the '622 patent—indeed, it was filed more than *three* years after expiration—Peter Whitford was required to submit a declaration providing "additional explanation of the circumstances surrounding the delay that establishes the entire delay was unintentional." *See* Exhibit G, page 3. The U.S. Patent Office requires such a declaration because, according to the

U.S. Patent Office, "[a]n extended period of delay (*i.e.,* more than two years from the date the application became abandoned, the patent expired, or a priority or benefit claim was due) in filing a petition to revive an application, accept a delayed maintenance fee payment, ... raises a question as to whether the entire delay was unintentional.  This may create uncertainty and unpredictability relating to patent rights in that **there is a greater likelihood that the entire delay may not be 'unintentional' ... as compared to a petition that was filed within a shorter time period** after the abandonment of the application, expiration of the patent...." 85 Fed. Reg. 41 at 12223 (published March 2, 2020) (emphasis added).

65.    In the '622 patent Revival Declaration, Peter Whitford asserted, under penalty of perjury, that, between 2006 and February 1, 2019, all mail for Plaintiff was received at his personal residence and, after that, was properly forwarded by the U.S. Postal Service to his new address.  Exhibit A, ¶7.  Peter Whitford further asserted that, after issuance of the '622 patent, "neither I nor Meridian received any communications related to, nor was I or Median aware of, the obligation to pay multiple maintenance fees."  *Id.*, ¶8.  In spite of purportedly not receiving any communication regarding his obligation to pay maintenance fees or the payment of the same, Peter Whitford's then-engaged law firm, FisherBroyles, LLP, apparently paid the 3.5 year maintenance fee for the '622 patent, which totaled $800, on Peter Whitford's behalf.  If Peter Whitford's declaration is to be believed, FisherBroyles, LLP paid this $800 maintenance fee without any communication to Peter Whitford and without seeking renumeration for the same, which is highly unlikely and simply not credible or plausible.  Also, if Peter Whitford is to be believed, FisherBroyles never sent, or he never received, the U.S. Patent Office's Maintenance Fee Reminder dated November 26, 2018, and the Notice of Patent Expiration dated May 13, 2019, which is highly unlikely and simply not credible or plausible.

66.    In his declaration, Peter Whitford vaguely states that "I understand now that a first maintenance fee (the 3.5 year fee) was paid by the law firm that assisted me in obtaining the '622 patent," but this means that Peter Whitford asserts he did not know or "understand" what FisherBroyles had done in paying the 3.5 year maintenance fee until April 2022, almost 7.5 years after the maintenance fee was paid.

67.    Peter Whitford further asserts, in his declaration, that "During the time period of April 2018 to April 2019, or at any other time until April 2022 when new and current registered patent counsel was engaged, neither I nor Meridian received any communication from anyone including prior patent counsel related to, nor was I or Meridian aware of, the obligation to pay a second maintenance fee (the 7.5 year fee)...." *Id.*, ¶10.  If Peter Whitford is to be believed, FisherBroyles never sent, or he never received, the U.S. Patent Office's Maintenance Fee Reminder dated November 26, 2018, and the Notice of Patent Expiration dated May 13, 2019, which is highly unlikely and simply not credible or plausible.

68.    Further lending to the implausibility of Peter Whitford's declaration, FisherBroyles publicly disclosed in October 2018 that it employed an "advanced, multi-functionality, web-based system" that "helps the law firm keep up with patent and trademark renewals and helps them meet client deadlines and build client reports."[14]

69.    Peter Whitford's assertions in this declaration to the U.S. Patent Office, therefore, are implausible and not credible at least because: (1) according to Peter Whitford's sworn declaration, his mailing address did not change until February 2019, well after the 7.5 year maintenance fee for the '622 patent was due and the '622 patent had expired and two relevant notices were sent to FisherBroyles

---

[14]    https://www.anaqua.com/resource/fisherbroyles-unifies-remote-workforce-anaqua/ (accessed December 14, 2023).

655 North Central Avenue
Suite 2300
Glendale, CA 91203-1445

LEWIS ROCA

and, presumably, forwarded or communicated to Peter Whitford at this longstanding address; (2) Peter Whitford must have been in regular communication with his patent attorney, Rachel Huffstetler (initially as a solo practitioner and later as a member of FisherBroyles)[15], while he resided at this address because the substantive prosecution of the '622 patent occurred between May 2010 and February 2011; (3) that FisherBroyles, a sophisticated law firm that had employed an advanced communication system for alerting clients of patent maintenance fees, purportedly failed to communicate with him in any way regarding maintenance fees, in spite of FisherBroyles paying the 3.5 year maintenance fee and receiving the Maintenance Fee Reminder on or around November 26, 2018 and the Notice of Patent Expiration on or around May 13, 2019; and (4) the assertion requires acceptance of the purported fact that Peter Whitford, a named inventor on numerous patents, and a sophisticated business person, purportedly had no knowledge whatsoever that maintenance fees were owed on U.S. patents.

70.    Similar to the '622 patent, the '866 patent expired on July 11, 2020, after payment of the 3.5 year maintenance fee (on December 23, 2015) but non-payment of the 7.5 year maintenance fee. Peter Whitford also retained the law firm of FisherBroyles, LLP, and in particular, the same patent practitioner, Rachel Huffstetler, to prosecute the '866 patent.

71.    Further similar to the '622 patent, FisherBroyles would have received the Maintenance Fee Reminder mailed by the U.S. Patent Office on March 2, 2020, and, presumably, would have forwarded it or communicated its content to Peter Whitford, yet the 7.5 year maintenance fee was not paid. *See* Exhibit H

---

[15] Peter Whitford originally retained Rachel Huffstetler to prosecute the '622 patent and subsequently retained FisherBroyles on April 2, 2012. However, the same practitioner—Rachel Huffstetler—filed the Power of Attorney appointing FisherBroyles as Peter Whitford's counsel. Thus, there was continuity in representation because Rachel Huffstetler joined FisherBroyles and brought Peter Whitford along as a firm client.

("Documents & transaction history of the '866 patent as downloaded from the U.S. Patent Office's Patent Center online system"). This is despite the same law firm having paid the 3.5 year maintenance fee without instruction from Peter Whitford.

72.     Further, FisherBroyles would have received the Notice of Patent Expiration mailed by the U.S. Patent Office on August 17, 2020, and presumably, would have forwarded it or communicated its content to Peter Whitford. *See* Exhibit H.

73.     Peter Whitford filed a Petition to Revive the '866 patent on April 29, 2022, asserting that "the delay in payment of the maintenance fee for this patent was unintentional," but because the Petition to Revive was filed within two years of the expiration of the '866 patent, a separate declaration was not required.  A true and correct copy of the '866 patent Petition to Revive is attached hereto as Exhibit I.

74.     Around this same time period, Peter Whitford filed another patent application that eventually matured into U.S. Patent No. 7,937,787, titled "Wall Bed Assembly."  This patent is unrelated to the subject matter of this lawsuit. The same situation occurred with this patent as did with the '622 patent and the '866 patent.  Specifically, Peter Whiteford retained FisherBroyles to prosecute this application, the 3.5 year maintenance fee payment was paid on October 15, 2014, but the 7.5 year maintenance fee was not paid and this patent expired on May 11, 2019.

75.     Thus, Peter Whitford, and specifically his law firm of FisherBroyles, paid the 3.5 year maintenance fees for *three* patent applications between September 3, 2014 and December 23, 2015, yet, according to Peter Whitford's sworn declaration, he was purportedly unaware of his obligation to pay maintenance fees to maintain patents.  Further, Peter Whitford strategically sought to revive only two patents, which are now the same two patents at issue in this

655 North Central Avenue
Suite 2300
Glendale, CA 91203-1445

LEWIS ROCA

lawsuit, leaving U.S. 7,937,787 expired. Peter Whitford, therefore, only sought to revive the two patents alleged in this lawsuit, and he only sought to revive these two patents *after* the accused product first came on to the market and after they had gained recognition and market share, giving these two patents perceived economic value.

76.    Additionally, on July 29, 2019, Peter Whitford retained a different patent practitioner, Michael O'Brien, to file U.S. Provisional Patent Application No. 62/880,012 (the "'012 provisional application"). A true and correct copy of the documents filed with the U.S. Patent Office on July 29, 2019, are attached hereto as Exhibit J[16]. Paragraph [0002] of the specification of the '012 provisional application states:

> [0002]    Prior to embodiments of the disclosed invention, a portable perimeter defense system was disclosed in U.S. Patent 7,918,622 issued to Whitford and in U.S. Patent 8,215,866 also issued to Whitford. Devices with the technology in these patents are sold by Meridian Rapid Defense Group LLC under the trade name ARCHER 750™. The entirety of these references is incorporated by reference.

77.    Thereafter, on September 29, 2020, Peter Whitford filed U.S. Patent Application No. 17/035,704 (the "'704 application"), which claimed the benefit of the '012 provisional application. Paragraph [0003] of the specification of the '704 application mirrored paragraph [0002] of the '012 provisional application except for the ™ being replaced by ®.

78.    Thus, at the very time his '622 patent and '866 patent were expiring due to non-payment of the 7.5 year maintenance fee, Peter Whitford was actively engaged in the preparation and filing the '012 provisional application and the '074 application, both of which expressly incorporated the subject matter of the '622

---

[16] The drawings filed on July 29, 2019, are omitted from Exhibit J due to their substantive size.

655 North Central Avenue
Suite 2300
Glendale, CA 91203-1445

LEWIS ROCA

and '866 patents.[17]   On information and belief, Peter Whitford would have been made aware of the expiration of the '622 patent and the upcoming 7.5 year maintenance fee due date in the '866 patent by his new patent counsel, Michael O'Brien.

79.    Accordingly, based on the above information, on information and belief, Peter Whitford is a sophisticated inventor having been awarded three patents and filing more represented by reputable patent counsel.  As such, on information and belief Peter Whitford was aware of his obligation to pay maintenance fees to maintain his patents, including the 3.5 year and 7.5 year maintenance fees but intentionally declined to pay, or have FisherBroyles pay, the 7.5 year maintenance fee in both Asserted Patents.  As explained above, inextricably, Peter Whitford paid (or had paid) the 3.5 year maintenance fee in three of his patents, then failed to pay the 7.5 year maintenance fee in each of those same three patents, yet only revived the two patents at issue in this lawsuit and having perceived economic value.

80.    Further, during the time period the patents asserted in this lawsuit were expiring for non-payment of the 7.5 year maintenance fee and while related Notices were being sent to FisherBroyles on his behalf, Peter Whitford was actively engaged in preparing and filing new patent applications based on the two patents asserted in this action.  In spite of these facts, Peter Whitford declared, under penalty of perjury to the U.S. Patent Office, that he was not aware of his obligation to pay the 7.5 year maintenance fee and that he was not made aware of the expiration of the '622 patent until April 6, 2022, three years after the filing the '012 provisional application that purported to disclose advancements over the '622 patent.  In the '866 patent, Peter Whitford, through his new patent counsel, declared

---

[17] The '622 patent expired on April 6, 2019, the '012 provisional patent was filed on July 29, 2019, the '866 patent expired on July 11, 2020, and the '704 application was filed on September 29, 2020.

655 North Central Avenue
Suite 2300
Glendale, CA 91203-1445

LEWIS ROCA

to the U.S. Patent Office that "The delay in payment of the maintenance fee for [the '866] patent was unintentional.

81.     On information on belief and based on the above-described facts and pattern of behavior, Peter Whitford's statements made to the U.S. Patent Office in his declaration dated April 29, 2022 in the '622 patent and in the declaration submitted on his behalf on April 29, 2022 in the '866 patent were false at least because the entire delay in payment of the 7.5 year maintenance fee for both the '622 and '866 patents was not unintentional.    On information and belief, Peter Whitford was made aware of his obligation to pay the 7.5 year maintenance fee in both Asserted Patents by his law firm, FisherBroyles and/by his other patent counsel, Michael O'Brien, and is a sophisticated inventor aware of his obligation to pay maintenance fees, yet he chose to not pay the 7.5 year maintenance fees in both Asserted Patents, which would render his statements to the U.S. Patent Office false.  On information and belief, Peter Whitford was made aware of the expiration of the Asserted Patents by his law firm, FisherBroyles, or by his other patent counsel, Michael O'Brien, yet he chose to not immediately petition to revive the same, which would further render his statements to the U.S. Patent Office false. *See* Exhibit G ("For example, a statement that the delay in payment of the maintenance fee was unintentional would not be proper when the patentee becomes aware of an unintentional failure to timely pay the maintenance fee and then intentionally delays filing a petition for reinstatement of the patent....").

82.     Had the U.S. Patent Office known that Peter Whitford intentionally allowed the Asserted Patents to expire and/or intentionally delayed petitioning to revive the Asserted Patents after discovery of their expiration, it would not have revived them.  Thus, Peter Whitford's misrepresentations and/or omissions to the U.S. Patent Office in his petitions to revive the Asserted Patents and in his declaration in support thereof were material to patentability, or to continued enforceability, of the Asserted Patents.

83.     Accordingly, Plaintiff should be precluded from asserting any claim of the Asserted Patents.

**MERIDIAN ENGAGES IN PATENT MISUSE BY ASSERTING**
**NON-COLORABLE INFRINGEMENT CLAIMS,**
**BASED ON ITS FRAUDULENTLY OBTAINED,**
**AND KNOWINGLY INVALID PATENTS**

84.     Plaintiff's claims are barred as a result of its patent misuse.

85.     Upon information and belief, and as one example, Plaintiff improperly attempts to broaden the scope of asserted claim 21 of the '622 patent to cover noninfringing products, including Delta's TB100 bollard, by interpreting the "upright plate" as the *cylindrical* body of the TB100 bollard as shown in Figure 9 of Plaintiff's Complaint (reproduced below) and the "width of said base plate" as being the diagonal dimension of the apparently square baseplate of the TB100 bollard in Figure 13 of Plaintiff's Complaint (reproduced below).



Figure 9[10]

Figure 13[15]

655 North Central Avenue
Suite 2300
Glendale, CA 91203-1445

LEWIS ROCA

86.    First, Plaintiff's interpretation of "upright plate" as covering a cylindrical member is contrary to the plain and ordinary meaning of "plate" and unreasonable in light of the '622 patent.  Indeed, a plate is commonly understood to be a thin, flat sheet-shaped element, which is consistent with the '622 patent's disclosure that the "[f]ront surface 15 [of the front plate 3] preferably offers ballistic protection" for people standing behind the barrier.  The cylindrical member in Delta's TB100 bollard is neither plate-shaped nor configured to offer an individual standing behind the cylindrical upright ballistic protection.  Indeed, the cylindrical member in Delta's TB100 bollard is a near opposite shape as the "upright plate" described and claimed in the '622 patent.  The '622 patent also fails to re-define the term "plate" as covering non-plate shapes, such as a cylindrical shape.  The only description of the "front plate" or "upright plate" shows a thin, flat shape and the only dimensional example of the front plate provided in the '622 patent is that it is "approximately 3 feet tall and 2 feet wide," that is, rectangular.

87.    Further, Plaintiff's interpretation of "width of said base plate" is not only incorrect as being contrary to the plain and ordinary meaning of the term "width" but also because it would render claim 21 of the '622 patent invalid as anticipated by prior art known to Plaintiff as of the filing of its Complaint.  First, elementary math dictates that the width of a rectangle is the dimension along its shorter side, or in the case of a square, is the dimension along any side.  This is confirmed by the mathematically accepted formula to determine the area of a rectangle, which is length times width, or of a square, which is side length (width and length being identical) squared.  Thus, "width" is different from the diagonal dimensional (or diagonal length), which is the distance between opposite corners of the rectangle or square and which Plaintiff proposes equating with "width" as recited in the '622 patent.  If one applied Plaintiff's definition of "width" to the formula to determine the area of a rectangle, an incorrect value would result, confirming    the    unreasonableness    of    Plaintiff's    proposed    interpretation.

For example, a square having 12" side length (i.e., a width and a length of 12") has a diagonal length of 16.97". But the mathematically accepted area of said square is 144 in.$^2$ (i.e., $12^2$), not 287.9809 in.$^2$ (i.e., $16.97^2$). Thus, Plaintiff's proposed interpretation of "width" is not only incorrect but is unreasonable as being contrary to accepted mathematical principles[18].

88.    Second, upon information and belief, as of the filing of its Complaint, Plaintiff knew that its interpretation of "width of said base plate" and "a non-planar aft edge," as applied to Delta's accused product, would render at least claim 21 of the '622 patent invalid in view of prior art known to Plaintiff as of the filing of the Complaint.    In particular, in the Office action dated May 27, 2010, in the application that matured into the '622 patent, the Examiner cited Figure 7 of U.S. Patent No. 4,854,767 to Sasaki ("Sasaki") as disclosing "an upright plate (4)" and "[a] base plate (2) for positioning on the ground, such that the upright plate (4) extends perpendicularly to the base plate (2)." Office action dated May 27, 2010, page 2.  In rejecting claim 24, which corresponds to issued claim 21, the Examiner asserted that "Sastaki [sic] discloses essentially all that is claimed, as put forth with respect to claim 1 above, but does not disclose providing friction elements to prevent horizontal movement of said barrier." *Id.*, page 5.  The applicant responded to the May 27, 2010, Office action on October 26, 2010, stating that, with respect to pending claim 24, issued claim 21, "[a]greement was reached that claim language directed to the base plate being substantially parallel to the ground surface or that the arcuate aft edge extends along a length of the base plate edge overcomes the stated rejection."

89.    In spite of these representations to the U.S. Patent Office, Plaintiff now attempts renege on its agreement with the U.S. Patent Office by reading

---

[18] The '622 patent also does not attempt to re-define the definition of "width" nor does it clearly set forth a special definition of the term "width."

655 North Central Avenue
Suite 2300
Glendale, CA 91203-1445

LEWIS ROCA

features out of claim 21 such that, under Plaintiff's own (flawed) interpretation, claim 21 would be invalid over Figure 7 of Sasaki under 35 U.S.C. § 102.



**Plaintiff's Interpretation of Accused Product (Figure 13 of Complaint)**



**Figure 7 of Sasaki (annotations added to correspond to Plaintiff's Figure 13)**

655 North Central Avenue
Suite 2300
Glendale, CA 91203-1445

LEWIS ROCA

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

90.    In other words, Plaintiff, by its Complaint, is attempting to improperly expand the scope of its patents beyond that which was granted by the USPTO, specifically to accuse Delta of infringement and to prevent Delta from making, using, selling, and offering for sale its competing TB100 product, rendering Delta unable to compete in the market for portable perimeter defense barriers and/or systems that can be rapidly positioned on most surfaces, including on hard surfaces such as asphalt, without requiring an anchoring system, in order to prevent vehicles from entering secure areas and which block access to venues and open spaces where vehicles can be used as weapons against pedestrians ("portable perimeter defense barrier market"), and therefore, harming the portable perimeter defense barrier market by preventing the rightful entry of a nascent competitor.

91.    As a second example, upon information and belief, as of the filing of its Complaint, Plaintiff knew that at least claim 49 of the '866 patent is invalid as being anticipated by or obvious in view of the pre-grant publication of its parent patent, that is, the '622 patent.  In more detail, the application that would mature into the '866 patent was filed on July 21, 2010, as a continuation-in-part of the '622 patent.  The application that would mature into the '622 patent first published as U.S. 2009/0067923 A1 on March 12, 2009.  Thus, the pre-grant publication of the '622 patent, that is, U.S. 2009/0067923 A1, is prior art to the '866 patent under pre-AIA 35 U.S.C. § 102(b) because it was published on March 12, 2009, more than one year before the July 21, 2010 filing date of the '622 patent.

92.    By way of relevant background, asserted claim 21 of the '622 patent requires, in part, "said base plate of said modular barrier comprising a non-planar aft edge configured to frictionally engage the ground surface **to prevent horizontal movement of said modular barrier upon impact**."  (emphasis added).

93.    The apparent new matter of the '866 patent recited in asserted claim 49 of the '866 patent, when compared to the '622 patent, is encompassed by the following limitation:

1  
2  
3  
4  
5  

said base plate having an aft and fore edge wherein said fore edge, facing the impact direction, comprises a vehicle engaging interface in the form of a nonlinear configuration extending along a portion of said base plate fore edge **wherein, under sufficient impact forces, said modular barrier pivots about said aft edge** and said fore edge engages an impacting vehicle.

6  

(emphasis added).

7  

94.    First, claim 21 of the '622 patent and claim 49 of the '866 patent

8  

describe and claim devices that operate to stop vehicle intrusion according to

9  

mutually exclusive principles.  For example, claim 21 of the '622 patent recites a

10  

device that does not move horizontally upon impact to stop said vehicle while claim

11  

49 of the '866 patent pivots such that the fore edge engages said vehicle to stop the

12  

vehicle.  Such pivoting action (i.e., rotational movement) necessarily includes both

13  

horizonal and vertical components.  Of particular interest, the portion of the

14  

claimed barrier above the pivot point would move horizontally rearward while the

15  

portion of the claimed barrier below the pivot point would move horizontally

16  

forward.  Yet, in spite of these mutually exclusive operating principles, Plaintiff

17  

accuses a single product, Delta's TB100 bollard, as infringing both claim 21 of the

18  

'622 patent and claim 49 of the '866 patent.

19  

95.    Second, the '622 patent is entirely silent as to a barrier pivoting upon

20  

impact by a vehicle.  Consistent with claim 21 of the '622 patent, the '622 patent

21  

only describes barriers that prevent horizontal movement upon vehicle impact to

22  

stop the vehicle.  For this same reason, the '622 patent does not inherently disclose

23  

a barrier that pivots to stop an impacting vehicle because, as explained above,

24  

pivoting necessarily includes some horizontal movement, which the '622 patent

25  

expressly describes as being prevented.

26  

96.    Nevertheless, by inconsistently accusing Delta's TB100 bollard as

27  

being both "to prevent horizontal movement ... upon impact" and being to "pivot

28  

about said aft edge and said fore edge engages an impacting vehicle," Plaintiff

655 North Central Avenue
Suite 2300
Glendale, CA 91203-1445

LEWIS ROCA

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

655 North Central Avenue
Suite 2300
Glendale, CA 91203-1445

LEWIS ROCA

indicates, for the first time and many years after the filing of either of the patents-in-suit, that the same physical barrier can somehow both prevent horizontal movement and pivot upon impact of a vehicle, meaning that the prior disclosure of the embodiment shown in FIGS. 4A, 5, and 15 of U.S. 2009/0067923 A1 obviates at least claim 49 of the '866 patent. For at least these reasons, upon information and belief, Plaintiff knew that asserted claim 49 of the '866 patent is invalid as obvious in view of the pre-grant publication of its own parent patent, also owned by Plaintiff and asserted in its Complaint.



FIG. 4A

125542953.3



*FIG. 15*

97.    As a third example, Plaintiff brought suit, relying solely on the Asserted Patents, with knowledge that the inventorship of the Asserted Patents is false due to the non-joinder of Mr. Jeffrey Fromm, rendering both of the Asserted Patents invalid under 35 U.S.C. § 102(f), as explained more fully above.

98.    Upon information and belief, Plaintiff's knowingly overbroad interpretation of the '622 patent, rendering the only asserted claim thereof invalid over known prior art, its assertion of a known invalid claim of the '866 patent, and its assertion of knowingly invalid patents due to the non-joinder of Mr. Fromm, the details of which are provided above, has an anticompetitive effect because of the exclusionary effects inherent to the issuance of a patent, which Plaintiff hopes to exercise against Delta to prevent Delta's rightful entry into the portable perimeter defense barrier market.  By preventing Delta and likely others from lawfully competing in the portable perimeter defense barrier market,  Plaintiff's actions harm the market by significantly reducing lawful competition.

99.    Delta has been engineering and manufacturing vehicle access control equipment and selling its products worldwide since 1974. Delta is a well-known and well-established supplier of barrier systems with a long and successful track record of succeeding in barrier markets for more permanent barrier structures. Absent Meridian's unlawful acts, based on Delta's past track record and experience in supplying more permanent barrier structures to governmental and private entities for many decades, Delta would become a strong competitor to Meridian in the relevant product market. By wrongfully asserting infringement in a manner that is well beyond the scope of its rights, and done in bad faith, Plaintiff impedes Delta's rightful entry into and/or expansion in the portable perimeter defense barrier market, which Delta was not in before its TB100 product.

100.    Further, on information and belief, Plaintiff commands a dominant share of the market for portable perimeter defense barriers, such that it operates with substantial market power.  On information and belief, and based on publicly available information, Meridian's revenues for portable perimeter defense barriers deployed in the United States, from 2017 to date, exceeds $51 million. On information and belief, the other suppliers for such products, which includes both U.S.-based and foreign-owned manufacturers that supply the relevant products into the U.S. market via U.S. distributors, total less than $5 million in total for revenues combined for portable perimeter defense barriers deployed in the United States, during that same timeframe. On information and belief, the two known foreign-owned suppliers, Mifram and Pitagone, each distribute their products in the United States via one or more U.S.-based distributors. On information and belief, Mifram barriers are offered for sale in the United States by a U.S.-based company, Security 20/20, Inc. On information and belief, Pitagone barriers are offered for sale in the U.S. via two distributors both located within the United States.  On information and belief, Meridian, therefore holds a substantial and significant share of the relevant product market, between 80-90% or more.

655 North Central Avenue
Suite 2300
Glendale, CA 91203-1445

LEWIS ROCA

101.   Further, to the extent Plaintiff has any meaningful competition in the portable perimeter defense barrier market, any such competitor cannot increase capacity in the short run, and significant barriers to entry prevent new competitors from entering this market.  Primarily, substantial design, development, testing, and certification requirements exist before a portable perimeter defense barriers  can be marketed and sold.  And, in connection with governmental sales, which constitute a substantial aspect of the vehicle barrier market, a supplier must not only offer a certified product but generally needs to show a satisfactory time-in-business, such as five years, before being approved by the GSA for sales to governmental entities.  These factors, alone or in combination, create substantial barriers to entry into the market for portable perimeter defense barriers, effectively restricting competition to only a handful of companies.

102.   Therefore, because Plaintiff is attempting to improperly broaden the scope of the '622 patent beyond the scope as granted by U.S. Patent Office, including by relying on an interpretation of the asserted claim of the '622 patent that is expressly disavowed during prosecution, and to assert a known invalid claim of the '866 patent in a manner that has anticompetitive effects, it has committed patent misuse.

103.   In addition, as explained above, Mr. Whitford made false representations to the USPTO regarding inventorship, and knowingly withheld material information from the USPTO, causing the Asserted Patents to be invalid and unenforceable.  Plaintiff asserts the Asserted Patents against Delta, knowing the Asserted Patents are invalid and unenforceable.

104.   Thus, Mr. Whitford engaged in fraud and misconduct at literally every stage of the patent proceedings.  Mr. Whitford falsely claimed to have invented the claimed barrier devices, Mr. Whitford knowingly withheld material prior art during prosecution, which if disclosed, would have resulted in the USPTO not issuing one or more claims.  After Mr. Whitford failed to pay maintenance fees, Mr. Whitford

falsely represented the reasons for failing to pay maintenance fees. Now, Mr. Whitford's company asserts these patents against its direct competitor Delta, and asserts clearly non-colorable infringement claims. Plaintiff's claims should all fail, and Delta should be awarded all recoverable damages.

### DELTA'S COUNTERCLAIM I: DECLARATORY JUDGMENT OF NON-INFRINGEMENT OF U.S. PATENT NO. 7,918,622
### (Asserted against Meridian)

105. Delta realleges and incorporates by reference its First, Third and Fourth Affirmative Defenses and Counterclaim Paragraphs 6 through 104 as if fully set forth herein.

106. Delta counterclaims against Meridian pursuant to the patent laws of the United States, Title 35 of the United States Code, and the Declaratory Judgments Act, 28 U.S.C. §§ 2201 and 2202.

107. Meridian claims to be the owner of the '622 patent, entitled "Portable Perimeter Defense Systems," filed on May 6, 2008, and issued on April 5, 2011. The '622 patent on its face identifies as inventor Peter D. Whitford. Upon information and belief, the '622 patent was assigned to Meridian Rapid Defense Group LLC on August 29, 2023.

108. An actual and justiciable controversy exists between Delta and Meridian with respect to the '622 patent because Meridian has brought an action against Delta alleging that Delta infringes the '622 patent by making, using, offering for sale, selling and/or importing certain barriers, including the TB100, which allegation Delta fully denies. Absent a declaration of noninfringement, Meridian will continue to wrongfully assert the '622 patent against Delta, and thereby cause Delta irreparable injury and damage.

655 North Central Avenue
Suite 2300
Glendale, CA 91203-1445

LEWIS ROCA

109.   Delta has not infringed the '622 patent, either directly or indirectly, literally or under the doctrine of equivalents, willfully or otherwise, and is entitled to a declaration to that effect.

### DELTA'S COUNTERCLAIM II: DECLARATORY JUDGMENT OF INVALIDITY OF U.S. PATENT NO. 7,918,622
### (Asserted against Meridian)

110.   Delta realleges and incorporates by reference its Second, Fourth, Sixth, Seventh, and Ninth Affirmative Defenses and Counterclaim Paragraphs 6 through 104 as if fully set forth herein.

111.   Delta counterclaims against Meridian pursuant to the patent laws of the United States, Title 35 of the United States Code, and the Declaratory Judgments Act, 28 U.S.C. §§ 2201 and 2202.

112.   Meridian claims to be the owner of the '622 patent, entitled "Portable Perimeter Defense Systems," filed on May 6, 2008, and issued on April 5, 2011. The '622 patent on its face identifies as inventor Peter D. Whitford. Upon information and belief, the '622 patent was assigned to Meridian Rapid Defense Group LLC on August 29, 2023.

113.   An actual and justiciable controversy exists between Delta and Meridian with respect to the '622 patent because Meridian has brought an action against Delta alleging that Delta infringes the '622 patent by making, using, offering for sale, selling and/or importing certain barriers, including the TB100, which allegation Delta fully denies.  Absent a declaration of invalidity, Meridian will continue to wrongfully assert the '622 patent against Delta, and thereby cause Delta irreparable injury and damage.

114.   The '622 patent is invalid under the provisions of Title 35 of the United States Code, including but not limited to Sections 102, 103 and/or 112, and Delta is entitled to a declaration to that effect.

**DELTA'S COUNTERCLAIM III: DECLARATORY JUDGMENT OF NON-INFRINGEMENT OF U.S. PATENT NO. 8,215,866**

**(Asserted against Meridian)**

115.    Delta realleges and incorporates by reference its First, Third, and Fourth Affirmative Defenses and Counterclaim Paragraphs 6 through 104 as if fully set forth herein.

116.    Delta counterclaims against Meridian pursuant to the patent laws of the United States, Title 35 of the United States Code, and the Declaratory Judgments Act, 28 U.S.C. §§ 2201 and 2202.

117.    Meridian claims to be the owner of the '866 patent, entitled "Portable Perimeter Defense Barrier And System," filed on July 21, 2010, and issued on July 10, 2012. The '866 patent on its face identifies as inventors Peter D. Whitford. Upon information and belief, the '866 patent was assigned to Meridian Rapid Defense Group LLC on August 29, 2023.

118.    An actual and justiciable controversy exists between Delta and Meridian with respect to the '866 patent because Meridian has brought an action against Delta alleging that Delta infringes the '866 patent by making, using, offering for sale, selling and/or importing certain barriers, including the TB100, which allegation Delta fully denies. Absent a declaration of noninfringement, Meridian will continue to wrongfully assert the '866 patent against Delta, and thereby cause Delta irreparable injury and damage.

119.    Delta has not infringed the '866 patent, either directly or indirectly, literally or under the doctrine of equivalents, willfully or otherwise, and is entitled to a declaration to that effect.

**DELTA'S COUNTERCLAIM IV: DECLARATORY JUDGMENT OF INVALIDITY OF U.S. PATENT NO. 8,215,866**

**(Asserted against Meridian)**

120.    Delta realleges and incorporates by reference its Second, Fourth,

655 North Central Avenue
Suite 2300
Glendale, CA 91203-1445

LEWIS ROCA

Sixth, Seventh, and Ninth Affirmative Defenses and Counterclaim Paragraphs 6 through 104 as if fully set forth herein.

121. Delta counterclaims against Meridian pursuant to the patent laws of the United States, Title 35 of the United States Code, and the Declaratory Judgments Act, 28 U.S.C. §§ 2201 and 2202.

122. Meridian claims to be the owner of the '866 patent, entitled "Portable Perimeter Defense Barrier And System," filed on July 21, 2010, and issued on July 10, 2012. The '866 patent on its face identifies as inventors Peter D. Whitford. Upon information and belief, the '866 patent was assigned to Meridian Rapid Defense Group LLC on August 29, 2023.

123. An actual and justiciable controversy exists between Delta and Meridian with respect to the '866 patent because Meridian has brought an action against Delta alleging that Delta infringes the '866 patent by making, using, offering for sale, selling and/or importing certain barriers, including the TB100, which allegation Delta fully denies. Absent a declaration of invalidity, Meridian will continue to wrongfully assert the '866 patent against Delta, and thereby cause Delta irreparable injury and damage.

124. The '866 patent is invalid under the provisions of Title 35 of the United States Code, including but not limited to Sections 102, 103 and/or 112, and Delta is entitled to a declaration to that effect.

## DELTA'S COUNTERCLAIM V: DECLARATION OF UNENFORCEABILITY OF U.S. PATENT NO. 7,918,622
### (Asserted against Meridian)

125. Delta realleges and incorporates by reference its Sixth, Seventh, and Ninth Affirmative Defenses and Counterclaim Paragraphs 6 through 104 as if fully set forth herein.

126. In prosecuting the '622 patent, Peter Whitford failed to disclose the prior public disclosure of the Fromm RDB 54 barrier one-sheet.

1    Had Peter Whitford disclosed the Fromm RDB 54 barrier one-sheet to the U.S.

2    Patent Office, at least one asserted claim of the '622 Patent would not have been

3    allowed. This inequitable conduct during prosecution of the Asserted Patents bears

4    an immediate and necessary relation to Plaintiff's enforcement of the '622 patent

5    at least because the inequitable conduct occurred while the '622 patent was pending

6    and because Plaintiff accuses the same product of infringing both patents. In light

7    of this inequitable conduct, the claims of the '622 patent should be declared

8    unenforceable based on conduct occurring during the prosecution of the '622

9    Patent.

10        127. The purported inventor of the '622 patent, Peter Whitford, on

11   information and belief, misrepresented that he was unaware of his obligation to pay

12   the 7.5 year maintenance fee and that the entire delay in paying the same was

13   unintentional. Based on this material misrepresentation, the U.S. Patent Office

14   revived the '622 patent three years after its expiration. In light of this inequitable

15   conduct before the U.S. Patent Office, the claims of the '622 patent should be

16   declared unenforceable.

## DELTA'S COUNTERCLAIM VI: DECLARATION OF UNENFORCEABILITY OF U.S. PATENT NO. 8,215,866

### (Asserted against Meridian)

18        128. Delta realleges and incorporates by reference its Sixth, Seventh,

19   Eighth, and Ninth Affirmative Defenses and Counterclaim Paragraphs 6 through

20   104 as if fully set forth herein.

21        129. In prosecuting the '866 patent, Peter Whitford failed to disclose the

22   prior public disclosure and offer for sale and/or sale(s) of Plaintiff's Archer 500

23   barrier. Had Peter Whitford disclosed the Archer 500 barrier to the U.S. Patent

24   Office, at least asserted claim 49 of the '866 patent would not have been allowed.

25   Despite acknowledging his duty to disclose material prior art, such as the Archer

26   500, to the U.S. Patent Office, Peter Whitford did not do so. Accordingly, in light

of this inequitable conduct, the claims of the '866 patent should be declared unenforceable.

130.  In prosecuting the '866 patent, Peter Whitford failed to disclose the prior public disclosure of the Fromm RDB 54 barrier one-sheet.  Had Peter Whitford disclosed the Fromm RDB 54 barrier one-sheet to the U.S. Patent Office, at least one of the asserted claims of the '866 patent would not have been allowed. In light of this inequitable conduct, the claims of the '866 patent should be declared unenforceable.

131.  The purported inventor of the '866 patent, Peter Whitford, on information and belief, misrepresented that he was unaware of his obligation to pay the 7.5 year maintenance fee and that the entire delay in paying the same was unintentional.  Based on this material misrepresentation, the U.S. Patent Office revived the '866 patent after its expiration.  In light of this inequitable conduct before the U.S. Patent Office, the claims of the '866 patent should be declared unenforceable.

**DELTA'S COUNTERCLAIM VII: *WALKER PROCESS* FRAUD;**

**ATTEMPTED MONOPOLIZATION UNDER 15 U.S.C. § 2**

**(Asserted against Meridian and Mr. Whitford)**

132.  Delta realleges and incorporates by reference its Second, Third, Fourth, Sixth, Seventh, Eighth, and Ninth Affirmative Defenses and Counterclaim Paragraphs 6 through 104 as if fully set forth herein.

133.  Mr. Whitford and Meridian fraudulently procured, revived, and brought this action based on the Asserted Patents.  During the prosecution of the Asserted Patents, Meridian, Mr. Whitford, and individuals associated with the prosecution of the Asserted Patents, including but not limited to the prosecuting attorney Rachel Huffstetter, failed to cite material prior art information, publications and other material showing, among other things, the existence of anticipating prior art more than one year prior to the relevant priority date.

Meridian, Mr. Whitford, and individuals associated with the prosecution of the Asserted Patents, including but not limited to the prosecuting attorney Rachel Huffstetler, withheld this prior art information, publications and other material from the USPTO with deceptive intent, and misrepresented prior art to the USPTO with deceptive intent. As to the misrepresentation of prior art, Mr. Whitford and Ms. Huffstetler falsely claimed that the Fromm barrier disclosed in U.S. Patent Application Publication No. US 2007/0272911A1 ('911 Application) "discloses a markedly different barrier system" because "at least four people [are required] to install each barrier . . . because the heavy, individual barriers according to the '911 application must be manually lifted to be positioned." *See* '622 Patent at column 1, lines 45-51. At least Mr. Whitford knew this statement was false because Fromm publicly disclosed, and separately disclosed directly to Mr. Whitford, that the Fromm barriers included wheels for transporting the Fromm barriers. In fact, the Fromm RDB 54 one-sheet (which Mr. Whitford prepared yet failed to disclose to the USPTO) explains that the Fromm barriers are "[l]ightweight and easy to deploy" and is an "interlocking barrier system that can be rapidly off loaded and deployed by *one* person" (emphasis added). It is further described as "Easy to Deploy" because "[t]he RDB 54 is the only barrier system in the world that can be deployed and reloaded by individual members of a tactical unit, male or female. Neither cranes nor heavy equipment are required." The one-sheet also describes the RDB 54 barrier as having "360° traversing wheels mounted on the base plate of each barrier, the wheels allow the barrier to be maneuvered easily by one person from location to location" and "can be disengaged in seconds to convert the barrier to a [sic] anti-vehicle barrier."

134. On information and belief, if Meridian, Mr. Whitford, and individuals associated with the prosecution of the Asserted Patents, including but not limited to the prosecuting attorney Rachel Huffstetler, had not withheld critical prior art

655 North Central Avenue
Suite 2300
Glendale, CA 91203-1445

LEWIS ROCA

information, or misrepresented the nature of the prior art, the USPTO would not have issued either of the Asserted Patents.

135.    As a result, Meridian, Mr. Whitford, and Ms. Huffstetler obtained the Asserted Patents by knowingly and willfully misrepresenting facts to the USPTO.

136.    Additionally, during the prosecution of the Asserted Patents, Meridian, Mr. Whitford, and individuals associated with the prosecution of the Asserted Patents, including but not limited to the prosecuting attorney Rachel Huffstetler, fraudulently identified Mr. Whitford as the sole inventor and failed to identify Mr. Fromm as an inventor of the Asserted Patents and withheld this information from the USPTO with deceptive intent.  These misrepresentations occurred at least in Mr. Whitford's inventorship declaration filed in the '622 patent on May 6, 2008 and in his declaration filed in the '866 patent on July 21, 2010.

137.    As a result, Mr. Whitford and Ms. Huffstetler obtained the Asserted Patents, to be solely to be owned and controlled by  Mr. Whitford and later by Meridian, by knowingly and willfully misrepresenting facts to the USPTO.

138.    Additionally, as alleged above, Meridian, Mr. Whitford, and Ms. Huffstetler knowingly let the Asserted Patents expire and Meridian and Mr. Whitford then waited more than two years to seek to revive the patents.

139.    Further, Mr. Whitford strategically sought to revive only two of his three patents, which are now the same two patents at issue in this lawsuit, leaving U.S. 7,937,787 expired. Mr. Whitford, therefore, only sought to revive the two patents alleged in this lawsuit, and he only sought to revive these two patents *after* the accused product first came on to the market and after they had gained recognition and market share, giving these two patents perceived economic value.

140.    On information on belief and based on the above-described facts and pattern of behavior, Mr. Whitford's statements made to the U.S. Patent Office in his declaration dated April 29, 2022 in the '622 patent and in the declaration submitted on his behalf on April 29, 2022 in the '866 patent were false at least

655 North Central Avenue
Suite 2300
Glendale, CA 91203-1445

LEWIS ROCA

because the entire delay in payment of the 7.5 year maintenance fee for both the '622 and '866 patents was not unintentional.    On information and belief, Mr. Whitford was made aware of his obligation to pay the 7.5 year maintenance fee in both Asserted Patents by his law firm, FisherBroyles and/by his other patent counsel, Michael O'Brien, and is a sophisticated inventor aware of his obligation to pay multiple maintenance fees, yet he chose to not pay the 7.5 year maintenance fees in both Asserted Patents, which would render his statements to the U.S. Patent Office false.    On information and belief, Mr. Whitford was made aware of the expiration of the Asserted Patents by his law firm, FisherBroyles, or by his other patent counsel, Mr. O'Brien, yet he chose to not immediately petition to revive the same, which would further render his statements to the U.S. Patent Office false.

141.    Had the U.S. Patent Office known that Meridian, Mr. Whitford, and Ms. Huffstetler intentionally allowed the Asserted Patents to expire and/or that Meridian and Mr. Whitford intentionally delayed petitioning to revive the Asserted Patents after discovery of their expiration, it would not have revived them. Thus, Mr. Whitford's misrepresentations and/or omissions to the U.S. Patent Office in his petitions to revive the Asserted Patents and in his declaration in support thereof were material to patentability, or to continued enforceability, of the Asserted Patents.

142.    Peter Whitford was the sole owner of both Asserted Patents until August 29, 2023, when he assigned both of the Asserted Patents to Meridian. On information and belief, Peter Whitford retained counsel to send the June 8, 2023, cease and desist letter to Delta alleging infringement of the Asserted Patents. Despite Peter Whitford being the sole owner of both Asserted Patents on June 8, 2023 and until August 29, 2023, Mr. Whitford's counsel represented in its June 8, 2023, letter that "We represent Meridian Rapid Defense Group LLC and its owner Peter Whitford (collectively 'Meridian')".    On information and belief, Peter Whitford intentionally included Meridian in the letter, and Mr. Whitford's

counsel intentionally designated Whitford and Meridian as "Meridian," despite Meridian lacking any relation to or ownership interest in the Asserted Patents, to deflect and obfuscate his role in the campaign to unfairly remove Delta's portable perimeter defense barriers from the market.   Mr. Whitford only assigned the Asserted Patents to Meridian on August 29, 2023, two days before this lawsuit was filed.

**The Relevant Product Market**

143.   The relevant product market consists of portable perimeter defense barriers and/or systems that can be rapidly positioned on most surfaces, including on hard surfaces such as asphalt, without requiring an anchoring system, in order to prevent vehicles from entering secure areas and which block access to venues and open spaces where vehicles can be used as weapons against pedestrians ("portable perimeter defense barrier market" or "relevant product market"). Such rapid and mobile deployment requires no electricity, no heavy equipment such as cranes or forklifts, no on-site construction, and no utilization of sand or water.  Governmental entities, including federal, state, municipal, and other local entities, and private entities have a need to provide such portable perimeter defense barrier for protection of open space events including but not limited to entertainment events, short term road closures, athletic events, festivals, graduations, community activities, farmer's markets, parades, and other places that vehicles could attack transitory events.  For example, open spaces regularly need protection that can be easily moved into place for events, mobilized to allow pedestrian access, defense against unauthorized vehicle intrusion, and movable to allow access by authorized vehicles such as emergency or supply vehicles, and readily removed at the conclusion of the gathering to allow departure from the event.

144.  Buyers of portable perimeter defense products would not view products such as traffic cones, portable gates, plastic cylinders, or other soft

technologies as a reasonable substitute because they are used for different purposes than portable perimeter defense barriers and/or systems. Such soft technology products are intended to direct vehicular and/or pedestrian traffic but have limited or no vehicle stopping power and, thus, cannot protect a secure area from unauthorized vehicular intrusion. Further, buyers often need to purchase soft technology products in addition to portable perimeter defense barriers and/or systems as these products complement each other rather than supplant each other. As such, buyers of soft technology products would not substitute them for portable perimeter defense products on the basis of relative prices.

145.    Buyers of portable perimeter defense products would not view surface guard systems as a reasonable substitute as these systems are not portable, require a palletized delivery, and cannot be moved for emergency access or evacuation such that they are unsuited to protect transitory events. As such, buyers of surface guard systems would not substitute them for portable perimeter defense products on the basis of relative prices.

146.    Buyers of portable perimeter defense products would not view cement medians, water barriers, metal fencing, concrete blocks, or other hard technologies as a reasonable substitute. Cement medians (also known as K-rail and Jersey barriers) are not portable, require a crane or forklift to deploy, are not crash tested or certified, and cannot be moved for emergency access or evacuation. Water barriers are not portable, not crash tested or certified, and cannot be moved quickly for emergency access or evacuation. Metal fencing will not stop a vehicle and is not crash tested or certified. Concrete blocks are not portable, require a crane or forklift to deploy, are not crash tested or certified, and cannot be moved quickly for emergency access or evacuation. Thus, these products are also unsuited to protect transitory events. As such, buyers of these products would not substitute them for portable perimeter defense products on the basis of relative prices.

147.   Buyers of portable perimeter defense products would not view larger, semi-permanent barrier systems which are installed into a location (likely requiring permitting, and electric) as a reasonable substitute because they are not easily or quickly portable, require a crane, forklift or special large wheeled carrier assemblies to deploy, may require electricity and hydraulics to operate, have a barrier arm that is moveable into a first position to block a vehicle and a second position allowing a vehicle to pass over the barrier, must be staffed, and require ongoing maintenance. Thus, these products are also unsuited to protect transitory events.  As such, buyers of these products would not substitute them for portable perimeter defense products on the basis of relative prices.

### The Relevant Geographical Market

148.   The relevant geographic market for the alleged attempted monopolization is the United States, including U.S.-based and foreign-owned suppliers who sell or offer such products for use in the United States including via U.S. distributors, as this is the area of effective competition where buyers can turn for alternative sources of supply, and includes the pool of goods that enjoy reasonable interchangeability of use and high cross-elasticity of demand.   On information and belief, foreign based companies who sell or offer their products in the United States do so via U.S.-based distributors, as local sales teams have the advantage of being able to develop and maintain long-term relationships with domestic users of the relevant products.  Moreover, on information and belief, U.S.-based distributors offer U.S. specific pricing based on supply and demand within the relevant product market in the United States and irrespective of prices offered by foreign manufacturers and foreign distributors of the same products in foreign markets.

149.   On information and belief, two known foreign-owned suppliers, Mifram and Pitagone, each distribute their products in the United States via one or more U.S.-based distributors or resellers. On information and belief, Mifram

655 North Central Avenue
Suite 2300
Glendale, CA 91203-1445

LEWIS ROCA

barriers are offered for sale in the United States by a U.S.-based company, Security 20/20, Inc. On information and belief, Pitagone barriers are offered for sale in the U.S. via two distributors both located within the United States.

150.   As explained above, Meridian and Mr. Whitford fraudulently obtained U.S. patents (the Asserted Patents), asserts them against Delta in this case, and seeks a permanent injunction throughout the United States prohibiting Delta from selling competing products in the relevant product market.  On information and belief, the other competitors to Meridian for the relevant market offer competing products that, based on Meridian's overly broad claim constructions, would also be subject to a nationwide injunction. If successful in its scheme, Meridian would seek nationwide injunctions against the remaining competitors, until Meridian has unlawfully excluded all competitors from the relevant product market in the United States.  If successful in its scheme, no competitor would be permitted to sell products in the relevant product market within the United States market, nor would they be able to import such goods into the United States for use.  Moreover, given the cost of defending against a patent infringement claim, one or more competitors, or would-be competitors may exit the market, may not enter the market, and/or may not devote substantial effort to expanding within the United States market in order to avoid the substantial costs involved in defending against a patent infringement suit.  Because Meridian is enforcing its U.S. patent rights and seeks an injunction throughout the United States, if successful in its scheme, Meridian would prevent any competitor or would-be competitor (whether U.S.-based or foreign-owned, selling via U.S. distributor or otherwise) from offering to sell, importing into, making, or selling any competing product in the relevant product market in the United States, thereby allowing Meridian to raise the price of its product(s) within the relevant product market in the United States.  Thus, the relevant geographical market would cover competitors, whether headquartered in the U.S. or outside the U.S., which offer their products in the relevant product market within the

1  United States and, if Meridian is successful in its scheme, would therefore be

2  subject to a permanent nationwide injunction as a result of Meridian's unlawful

3  assertion of its fraudulently obtained patents and overly broad claim construction

4  positions.

5  **Dangerous Probability of Achieving Monopoly Power**

6  151.  Due in large part to Mr. Fromm's early work on his RDB 54 Barrier,

7  which Whitford and later Meridian misappropriated, Meridian was an early entrant

8  into the relevant product market with its Archer line of portable perimeter defense

9  barriers and systems.  On information and belief, and based on publicly available

10  information, Meridian's revenues for portable perimeter defense barriers deployed

11  in the United States, from 2017 to date, exceeds $51 million.  On information and

12  belief, the other potential suppliers for such products, which includes both

13  U.S.-based and foreign-owned suppliers that supply the relevant products into the

14  U.S. market via U.S. distributors, total less than $5 million in total for revenues

15  combined for portable perimeter defense barriers deployed in the United States,

16  during that same timeframe.  On information and belief, Meridian, therefore, holds

17  a substantial and significant share of the relevant product market, between 80-90%

18  or more.

19  152.  As alleged above, Meridian and Whitford have engaged in fraud, have

20  fraudulently obtained, and now assert those fraudulently obtained patents in the

21  United States against a new competitor in the marketplace, Delta, seeking a

22  nationwide permanent injunction.  Delta is a leading manufacturer of vehicle access

23  control equipment. Delta has been engineering and manufacturing vehicle access

24  control equipment and selling its products worldwide since 1974. Delta is a

25  well-known and well-established supplier of barrier systems with a long and

26  successful track record of succeeding in barrier markets for more permanent barrier

27  structures.  Absent Meridian's unlawful acts, based on Delta's past track record and

28  experience in supplying more permanent barrier structures to governmental and

655 North Central Avenue
Suite 2300
Glendale, CA 91203-1445

LEWIS ROCA

private entities for many decades, Delta is uniquely positioned to be a strong competitor to Meridian in the relevant product market.  On information and belief, when Meridian first learned that Delta was coming to market with portable barrier products that directly competed with Meridian's portable perimeter defense barriers, Meridian began their unlawful attempts to thwart Delta's entry into that market given Delta's long track record of success in providing vehicle access control equipment.  After receiving a cease and desist letter from Whitford (who owned the Asserted Patents at that time), Delta shared with Whitford's counsel sales information regarding the accused products and offered to take a license. In spite of the relatively low number of past sales of the accused products, Whitford and Meridian refused to consider any license and again demanded that Delta exit the relevant product market.  Meridian is therefore using its Asserted Patents, fraudulently acquired by Whitford, to unlawfully force Delta from the relevant product market.

153.    In addition, as explained above in Delta's patent misuse affirmative defense, incorporated by reference in this cause of action, in asserting its patent infringement claims, Meridian attempts to unlawfully broaden the scope of its Asserted Patents to cover Delta's noninfringing products, including Delta's TB100 bollard.  For example, Meridian's claim construction positions impermissibly seek to broaden the scope of the Asserted Patents to cover potentially any competing product in the portable perimeter defense barrier market.  Meridian, for example, contends that an upright plate should be construed to mean any structural member, including a cylinder, even though there is no colorable support for such a claim. Even after this Court's ruling precluding such an interpretation, Meridian has maintained that the accused products infringe under the doctrine of equivalents, which similarly lacks any colorable support and evidences Meridian's unlawful scheme to drive competitors from the relevant market regardless of its actual patent rights.  Meridian also contends, for example, that even a standard, square plate with

four corners has a "sawtooth" edge, even though there is no colorable support for such a claim. Meridian also contends, for example, that a non-planar or curved aft edge does not have to be non-planar or curved at all. Delta has incurred substantial damages including but not limited to expending hundreds of thousands of dollars in attorneys' fees, to defend against these patent infringement claims, including the cost of litigating against Meridian's meritless claim construction positions.

154. If successful with this scheme, Meridian will obtain a nationwide permanent injunction to prevent Delta from selling a competing product, in the relevant product market, within the United States. If successful in its scheme, Meridian has a dangerous probability of achieving monopoly power. No competitor would be permitted to sell products in the relevant product market within the United States market, nor would they be able to import such goods into the United States for use. Moreover, given the cost of defending against a patent infringement claim, one or more competitors, or would-be competitors may exit the market and/or not enter the market to avoid the substantial costs involved in defending against a patent infringement suit. Because Meridian is enforcing its U.S. patent rights and seeks an injunction throughout the United States, if successful in its scheme, Meridian would prevent any competitor or would-be competitor (whether U.S.-based or foreign-owned, selling via U.S. distributor or otherwise) from offering to sell, importing into, making, or selling any competing product in the relevant product market in the United States.

155. On information and belief, it is common for patent owners to bring infringement actions against one competitor at a time until they have eliminated all competition. Meridian already holds at least an 80-90% or more market share for the relevant product market. On information and belief, Meridian first filed suit against Delta to unlawfully exclude them from the relevant market because they viewed Delta as the biggest threat to Meridian, and, on information and belief,

125542953.3

Meridian will bring similar actions against all such competitors who threaten Meridian in the relevant market, if necessary, until there are no competitors left.

156.   Further, to the extent Meridian has any meaningful competition in the market for portable perimeter defense barriers, any such competitor cannot increase capacity in the short run, and significant barriers to entry prevent new competitors from entering this market.  Primarily, substantial design, development, testing, and certification requirements exist before portable perimeter defense barriers can be marketed and sold in the United States.  And, in connection with governmental sales, which constitute a substantial aspect of the vehicle barrier market, a supplier must not only offer a certified product but generally needs to show a satisfactory time-in-business, such as five years, before being approved by the GSA for sales to governmental entities.  These factors, alone or in combination, create substantial barriers to entry into the market for portable perimeter defense barriers, effectively restricting competition to only a handful of companies..

157.   As is necessary with all serious entrants into the field of vehicle barriers, Delta spent significant capital to design, develop, test, and certify its TB100 bollard.  Indeed, to be considered a true vehicle barrier, certain industry-standard tests must be conducted and the product certified based on its ability to stop different classes of vehicles.  These high barriers to entry, and the necessary strong base of institutional knowledge to design effective vehicle barriers, drive up the cost of introducing new vehicle barriers and limit the overall number of competitors in the field in a time when vehicular attacks are increasing worldwide.

158.   Meridian and Mr. Whitford's fraud on the USPTO violates Section 2 of the Sherman Act, 15 U.S.C. § 2. Through this fraud, Meridian and Mr. Whitford engaged in predatory and/or uncompetitive conduct with a specific intent to unlawfully monopolize.

159.   As a result of Meridian's and Mr. Whitford's unlawful acts, Delta has suffered and will continue to suffer antitrust injury in an amount to be proven at trial.  Meridian's attempted enforcement of the Asserted Patents against Delta at the direction of Mr. Whitford, and Meridian's anti-competitive conduct at the direction of Mr. Whitford have produced significant injury to Meridian and to competition.

160.   Meridian's and Mr. Whitford's unlawful acts are aimed at significantly reducing competition.  Meridian's and Mr. Whitford's unlawful acts including the bringing of suit based on one or more patents known to be fraudulently obtained. These actions are unlawful under the antitrust laws because Meridian attempts to gain an unlawful monopoly based on the fraudulently-obtained patents. Delta's attorneys' fees incurred to defend against these claims flow directly from this unlawful aspect of Meridian's acts, and Delta is therefore entitled to recover, at least, trebled attorneys' fees it has incurred, and will incur, to defend against the claims of infringement of the Asserted Patents, and any other recoverable damages.

**PRAYER FOR RELIEF**

WHEREFORE, Delta respectfully prays for judgment and relief as follows:

A.   Dismissal of Meridian's Complaint with prejudice, with judgment entered in favor of Delta as to all such claims and entered against Meridian and Mr. Whitford on all such claims, and that any and all relief requested by Meridian be denied;

B.   That judgment shall be entered in favor of Delta and against Meridian and Mr. Whitford, on each of Delta's Counterclaims and Affirmative Defenses;

C.   That each and every claim of the '622 patent, and the '866 patent be declared not infringed, invalid, and unenforceable;

D.   An award to Delta of all recoverable monetary relief including but not limited to actual damages;

E.   Disgorgement of Meridian's profits;

F.   Restitution;

G.   A finding that Meridian and Mr. Whitford violated Section 2 of the Sherman Act, 15 U.S.C. § 2 and awarding treble damages, including but not limited to an award to Delta of its attorneys' fees incurred, trebled;

H.   Permanently enjoining Meridian and Mr. Whitford against monopolizing or attempting to monopolize the relevant product and geographic markets, as provided by 15 U.S.C. § 26;

I.   An award to Delta of pre-judgment and post-judgment interest;

J.   A determination that this is an exceptional case and an award to Delta of its costs in this action, including its reasonable attorneys' fees under at least under 35 U.S.C. § 285 and any other applicable authority; and

K.   That Delta be awarded such other and further relief as the Court deems proper.


Dated:  August 1, 2024                Respectfully submitted,
                                      LEWIS ROCA ROTHGERBER
                                      CHRISTIE LLP

                                      By   /s/Kyle W. Kellar
                                      Constantine Marantidis
                                      G. Warren Bleeker
                                      Kyle W. Kellar

                                      Attorneys for Defendant and
                                      Counterclaimant
                                      DELTA SCIENTIFIC CORPORATION

655 North Central Avenue
Suite 2300
Glendale, CA 91203-1445

LEWIS ROCA

1

**JURY DEMAND**

2

Delta Scientific Corporation demands a trial by jury on all issues so triable.

3

4
Dated:  August 1, 2024                    Respectfully submitted,

5
                                          LEWIS ROCA ROTHGERBER
                                          CHRISTIE LLP
6

7
                                          By   */s/Kyle W. Kellar*
                                             Constantine Marantidis
8                                            G. Warren Bleeker
                                             Kyle W. Kellar

9
                                          Attorneys for Defendant and
10                                        Counterclaimant DELTA SCIENTIFIC
                                          CORPORATION

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28